STATE EX REL. INTER-STATE IRON COMPANY AND
ANOTHER v. J. G. ARMSON AND OTHERS.[1]

February 26, 1926.

No. 24,970.

**What courts can review in order of tax commission fixing occupation tax of mining company.**

1. In reviewing the determination by the Tax Commission of the occupation tax imposed upon a mining company, the courts can only inquire whether the evidence furnished a reasonable basis for the determination and whether the commission acted arbitrarily, exceeded its jurisdiction, or proceeded on an erroneous legal theory.

**What deductions commission should have made in ascertaining value of ore at mine.**

2. To ascertain the value of the ore at the mine, the commission began with the market quotations at Lake Erie ports and worked backward. It made certain deductions, but refused to allow the claim of relators to others. It rejected their claim for taxes paid on a washing plant; allowed in part only their claim for depreciation in the value of the plant; disallowed taxes paid on ore in stock piles; and refused an allowance for the reduced value of ore with high percentage of phosphorus. It is *held* that the commission should have allowed taxes paid on a washing plant; that, under the evidence, it allowed a sufficient amount for depreciation in the value of the plant; that it should have allowed taxes paid on ore in stockpiles; and that it should have allowed for the reduced value of ore with a high percentage of phosphorus.

**When intent of legislature is in doubt, doubt should be resolved in favor of taxpayer.**

3. L. 1921, c. 223, § 2, does not authorize the deduction of all of the costs of mining from the value of the ore mined. In drawing the line between allowable and nonallowable costs, the commission is governed by the rule stated in State v. Minn. Tax Com. 132 Minn. 93, 155 N. W. 1061, that where a statute is capable of two construc-

[1]Reported in 207 N. W. 727.

tions and the intent of the legislature is in doubt, the doubt should be resolved in favor of the taxpayer.

**Other proper deductions to be made.**

4. Under subdivision 1 of section 2, the cost of a reasonable amount of fire insurance and the annual depreciation in the value of the mining plant and equipment are proper deductions, but the expense of legal services is not.

**Definition of "royalties" in statute.**

5. The word "royalties," as used in subdivision 4, § 2, means the share of the product of a mine delivered, or the money paid to the owner of the land, or one who holds under him, for permission to mine and remove the ore. Money so paid is rent and not the purchase price of ore in place. Neither the time nor the manner of payment, nor the form of the instrument executed by the fee owner, is controlling. The purpose for which the payment was made is the test by which to determine whether or not it was in the nature of a royalty. The evidence was not sufficiently definite and certain to require the commission to allow certain deductions claimed as advance payments of royalty.

**Each mine to be treated as separate unit.**

6. For the purpose of determining the tax, each mine operated is to be treated as a separate unit, although several are operated by the same company.

Licenses, 37 C. J. p. 250 n. 68, 69, 73 New.
Mines and Minerals, 27 Cyc. p. 710 n. 33.

Certiorari to review the action of the Minnesota Tax Commission determining the amount of the 1924 occupation tax of relator companies. Remanded.

*Abbott, MacPherran, Dancer, Gilbert & Doan, W. D. Evans* and *Hale Hill*, for relators.

*Clifford L. Hilton*, Attorney General, *G. A. Youngquist*, Assistant Attorney General, and *Patrick J. Ryan*, for respondents.

LEES, C.

Certiorari to review the determination by the Minnesota Tax Commission of the occupation tax for the year 1924 to be paid by the

Inter-State Iron Co. and the Leetonia Mining Co. The interpretation of L. 1921, p. 274, c. 223, as amended by L. 1925, p. 422, c. 307, and the propriety of the commission's application of the law are to be considered.

The general powers and duties of the commission are defined by G. S. 1923, § 2364. Chapter 223 provides that one of their duties is to determine the value of iron ore mined each year in the state of Minnesota. The relators are here asserting that the ore produced at their mines has been overvalued. The primary responsibility for a correct determination of the tax rests upon the commission. In placing a valuation upon the ore, the commission occupies a position much the same as that of an assessor, who exercises a quasi judicial function in determining the value of property subject to taxation, Stewart v. Case, 53 Minn. 62, 54 N. W. 938, 39 Am. St. 575, and whose determination is presumed to be the expression of his honest judgment. State v. London & N. A. M. Co. 80 Minn. 277 (286), 83 N. W. 339. It is well settled that in reviewing an order or determination of an administrative board, this court will go no further than to determine: (1) Whether the board kept within its jurisdiction; (2) whether it proceeded on a correct theory of the law; (3) whether its action was arbitrary, oppressive or unreasonable and represented its will and not its judgment; and (4) whether the evidence was such that it might reasonably make the order or determination in question. State ex rel. v. State Securities Com. 145 Minn. 221, 176 N. W. 759, and cases collected in Dun. Dig. 1921 Supp. § 397b.

With these preliminary observations we proceed to the specific questions presented.

Nearly all iron ore mined in this state is marketed at ports on the lower lakes. The price of standard ore is fixed at the opening of the season of navigation, but we are not told how or by whom this is done. When fixed, the price remains the same throughout the year, hence it can hardly be said that it fairly represents the actual market value of the ore. The trade journals call it the Lake Erie or Cleveland base price of Lake Superior ores.

The following language, taken from the Ninth Biennial Report of the commission, discloses its method of procedure:

"In trade practice there is no recognized market value of ore at the mouth of the mine, nearly all iron ore being sold for delivery at Lake Erie points. It was therefore necessary for the Tax Commission to follow the ore to the place of its principal sale, and there ascertain its market value, and then work back to the mouth of the mine to determine its value 'at the place where it was brought to the surface of the earth.' To carry out this plan, the Commission adopted as basic values what is known in trade practice as the Lake Erie base prices of standard ores, fixed annually, usually, by early spring sales of ore and generally regarded by the trade as being fairly representative of actual market values."

It becomes important then to ascertain whether, in working back to the mine, all expenses incurred beyond the mouth of the mine, which were reflected in the Lake Erie base prices, were deducted therefrom. Counsel for the state cite State v. West. Union Tel. Co. 96 Minn. 13, 104 N. W. 567, in support of their claim that no nonstatutory deductions can be considered because the final determination by the commission of the value of the ore is conclusive unless it be shown that a mistake was made which is so gross as to be inconsistent with the exercise of a fair and honest judgment. They make this statement in their briefs:

"The so-called non-statutory deductions are merely steps in the Commission's process of arriving at the value of the ore at the mouth of the mine, analogous to the mental processes of an assessing officer, and not open to examination."

Counsel for the relators reply that the statute charges the commission with the duty of ascertaining the value of the ore at the mouth of the mines and not at the place where it is sold and delivered; that, in proceeding as they did, the commission violated the statute by setting up a new standard of value not contemplated by the legislature, hence there is no presumption that their conclusions are correct, and we are referred to L. & N. R. Co. v. Greene, 244

U. S. 522, 37 Sup. Ct. 683, 61 L. ed. 1291, Ann. Cas. 1917E, 97, as supporting this proposition. We need not consider the merits of the opposing contentions. It is enough to say that we see no reason for holding that the commission proceeded erroneously in their effort to ascertain the value of the ore at the mines. Given the market price of an article at the place of sale and delivery, its value at the place of production can be ascertained to a fair degree of certainty by deducting from the market price all reasonable and necessary costs and charges which intervene and which must be met before the article is delivered to the purchaser. By a process of addition and subtraction, the right result can be reached, and it should be presumed that it was reached. However, the presumption is not conclusive and, if there were demonstrable errors and they are brought to light, it is our duty to correct them.

The relators insist that the following deductions were erroneously disallowed: (a) Taxes paid on the washing, screening and crushing plant of the relator Inter-State Iron Co.; (b) a sufficient amount for depreciation in the value of the plant; (c) taxes paid on ore at the mouth of the mine on May 1, 1924; (d) an allowance on account of diminution in the value of ores containing a high percentage of phosphorus.

Some iron ores are of such a low grade that they have little value until a substantial portion of the foreign matter has been removed. It can be and is removed at washing plants, the process being known as beneficiation. Like mining, it is equivalent in its results to a manufacturing process. Stratton's Independence, Ltd. v. Howbert, 231 U. S. 399, 34 Sup. Ct. 136, 58 L. ed. 285. It is clearly described in State v. Hobart Iron Co. 143 Minn. 457, 172 N. W. 299, 175 N. W. 100, 176 N. W. 758, where it was held, in harmony with the state's then contention, that "the washing process is not mining and the concentrates the result of mining."

The commission deducted from the Lake Erie prices the actual expense of beneficiation and $27,326.38 for depreciation in the value of the plant. The Inter-State Iron Co. claimed an allowance of $38,194.96. We sustain the action of the commission, for, under the

evidence, it cannot be held that the finding that the smaller sum was a fair allowance for depreciation was arbitrary or without a reasonable basis for its support.

The claim to a deduction for taxes was put upon the ground that they are an element of the cost of beneficiating low grade ores and are reflected in the market price of the concentrates. We think the claim should have been allowed. Whether a producer has a plant of his own or has the ore treated at a plant owned by someone else, taxes are a factor which inevitably enter into the cost of the process and are a proper nonstatutory deduction.

The commission was of the opinion that, if taxes are allowed at all, the amount paid in 1924, and not the amount of the assessment for that year, should be deducted. It is of no great consequence whether the allowance is made on one basis or the other, provided the amount paid is ultimately allowed and deducted from the market price of beneficiated ore. Of course the mere fact that the plant is assessed is not enough to entitle the taxpayer to the deduction; he must show the actual payment of the tax.

What has been said about taxes on washing plants is applicable to taxes on ore mined in the winter and carried in stockpiles on May 1. Such taxes affect the market price of the ore. Shipments are rarely made before May 1. A mining company must pay the tax if it owns the ore on May 1. If the ore was sold prior to that date, the purchaser must pay it. In either case the difference between the market price and the value of the ore at the mouth of the mine consists in part of the tax, and we think the amount thereof must be deducted in order to ascertain the true value of the ore at the surface.

The ore taken from the Hill annex mine, one of the mines owned by the Inter-State Iron Co. contained a higher percentage of phosphorus than standard ore. A witness testified that for this reason it carried a penalty of 20 cents a ton, that is, it sold for that much less than standard ore. A deduction was claimed on this account, but the claim was disallowed. Ore with a high phosphorus content has to be mixed with other ore to bring it up to standard. It does

not command the price for which standard ore sells. Some deduction from the market price thereof should have been allowed in fixing the value of the ore produced at the Hill Annex mine.

We come now to deductions claimed under subdivisions 1-5, § 2, pp. 274, 275, c. 223.

Fairly construed, the statute does not authorize the deduction of all the costs of mining. In Anaconda Copper Mining Co. v. Junod, 71 Mont. 132, 227 Pac. 1001, the court construed a statute of that state imposing a tax on mining companies, and providing for the deduction of the actual cost of extracting ore from the value thereof. It was held that it was not the intention of the legislature to permit the deduction of every conceivable item of expense; that the words "actual cost" were used in a restricted sense; and that taxes and fire insurance premiums paid on milling and reduction works were not deductible items. The reasoning is persuasive insofar as it deals with the distinction between the cost of bringing ore to the surface of the ground and the cost of carrying on the business of mining. We think that under our statute a similar distinction should be made.

Subdivision 1 clearly limits allowable deductions to those expenses which must be paid to take the ore from its bed and bring it to the surface of the ground where it can become an article of commerce and be utilized in the industrial arts. See Oliver Iron Co. v. Lord, 262 U. S. 172, 43 Sup. Ct. 526, 67 L. ed. 929. These expenses are separated from those incurred generally in conducting the business of mining. We shall not attempt to draw the line of demarcation. It must be defined by a process of inclusion and exclusion as specific deductions are claimed by the mining companies.

The specific mention of allowable deductions shows a legislative intention to exclude those not mentioned. Those specifically allowed are the reasonable cost of severing the ore from its natural bed and bringing it to the surface; the cost of removing the overburden from an open pit mine; the cost of sinking shafts and running drifts in an underground mine; royalties; and a percentage of the annual tax on the land in which the ore is deposited.

L. 1925, p. 388, c. 307, amends subdivision 1 of section 2, chapter 223, by inserting the words "supplies used and labor performed at the mine." Counsel for the state do not contend that the amendment changed the law in any material respect. They say that clarification of the statute was the sole purpose the legislature had in mind and that all we should do is to announce the proper construction of the language. In so doing we observe the rule approved in State v. Minn. Tax Com. 132 Minn. 93, 155 N. W. 1061, viz:

"In the construction of tax laws * * * where a statute is capable of two constructions and the intent of the legislature is in doubt, such doubt should as a rule be resolved in favor of the taxpayer."

Taking up, deductions claimed but disallowed, we come first to fire insurance premiums and legal expenses paid. If subdivision 1 is narrowly construed, insurance premiums cannot be deducted, for it is not essential to the process of mining that the equipment at the mine should be insured. But it is a matter of common knowledge that in nearly every line of business men protect themselves against fire losses by carrying insurance. We are advised in the briefs that the Federal government allows the cost thereof to be deducted in computing income taxes. Although we are dealing with an occupation and not an income tax, and although the basis for the determination of the tax is entirely different, we think the cost of a reasonable amount of insurance on structures and mining equipment used for the purpose of extracting the ore from a mine is a legitimate and ordinary expense of that branch of the business of mining which consists in severing the ore from its bed and bringing it to the surface, and that the commission erred in refusing to make any allowance on this account.

By no sound process of reasoning can it be shown that money paid for legal services represents an expenditure directly related to the separation of ore from its natural bed, hence this item was properly disallowed.

Depreciation in the value of the mining plant and equipment was claimed but disallowed. The state takes the position that subdivi-

sion 1 authorzes the deduction of no expense whatever except wages and supplies such as fuel, oil, explosives and the like. We are of a contrary opinion. Steam shovels and hand tools are used to separate the ore from its bed. Machinery is used to hoist the ore to the surface. Everyone knows that tools and machinery wear out and that money must be expended to repair or replace them. Whether a mining company uses a steam shovel to dig ore or hires men to dig it, the cost of the process must be paid. It would be illogical to hold that wages of laborers may be deducted, but not the reasonable expense of repairing and replacing an appliance which does the work of many men more efficiently and economically than it could be done by hand labor.

One of relators' claims which was disallowed is designated in the briefs as "liquidated advance royalties." It appears that in 1901 Peter L. Kimberly owned two mines and all but three shares of stock in a corporation which had leased a third mine from the state. He gave the firm of Jones & Laughlin of Pittsburgh, Pa., an option to lease the two mines and take an assignment of the state lease of the third mine, $950,000 to be paid if the option was exercised. Jones & Laughlin exercised it, paid the sum mentioned and agreed to pay in addition 20 cents a ton as an annual royalty on a minimum of 50,000 tons. Subsequently Jones & Laughlin assigned the leases to the Inter-State Iron Co. We are concerned with but one of these mines, the Lincoln. The claim is made that part of the down-payment was exacted for the privilege of removing the ore from this mine, and that, as the ore is removed, a percentage of the payment is deductible as a royalty paid in advance.

Much is said in the briefs about the meaning of the word "royalty," as used in chapter 223. As applied to a mine, the commonly accepted definitions of the word are: A share of the product or profit of the mine reserved by the owner for permitting another to use the property, Webster's New International Dictionary; a payment made to the landowner by the lessee of a mine in return for the privilege of working it, New Oxford English Dictionary. See 4 Words & Phrases (2d Ser.) p. 418.

The definition of the word in the act imposing a tax on royalties, L. 1923, p. 258, c. 226, is substantially the same as above.

Formerly the word referred to the prerogative of the king to take gold and silver discovered in land privately owned. Bainbridge, Mines & Minerals, pp. 110-113. Now it refers to the share of any ore which must be delivered to the landowner, or one who holds under him, and to its equivalent in money when that is the medium of compensation. Under the conventional mining lease, money so paid is rent and not the purchase price of the ore in place. State v. Evans, 99 Minn. 220, 108 N. W. 958, 9 Ann. Cas. 520; State v. Royal Min. Assn. 132 Minn. 232, 156 N. W. 128, Ann. Cas. 1918A, 145; Minn. L. & T. Co. v. Douglas, 135 Minn. 413, 161 N. W. 158; State v. Cavour Mining Co. 143 Minn. 271, 173 N. W. 415.

The lease may provide that payment shall be made in advance or that the lessee shall pay a minimum annual royalty whether he takes any ore or not. In either case, under our previous decisions, the money received by the lessor must be regarded as rent, and, if it is rent, within all the definitions it is essentially a royalty. Payment at stated intervals when and as the ore is removed is not the sole test by which to determine whether the payment was a royalty. Whether the lease obligates the lessee to pay a fixed sum upon the execution thereof or at a future date, or in instalments spread over a stated period of time, if the grant of the privilege of mining and taking the ore from the land is the consideration for the payments, they are royalties.

Little importance should be attached to the form of the instrument granting the privilege, for neither the commission nor the court is bound to accept it for what it appears to be upon its face. By expressing their agreement in language appropriate to a contract of sale, the parties may not transform what was intended to be a lease into something else, or preclude the commission or the court from looking behind the form of the instrument to ascertain its true nature.

In State v. Cavour Mining Co. supra, the court considered a lease of mineral land owned by the state. The lease provided for the

annual payment of a minimum sum whether any ore was removed or not. The court said:

"The minimum royalty is the compensation agreed by contract to be paid for the use and occupancy for a year of the property demised for the purposes and uses and in the manner and with the rights fixed by the lease, and for it the lessee gets, among other things, the right to take within the year 5,000 tons of ore. It is not the purchase price of 5,000 tons, which, if not taken, may be subsequently taken. It is not a payment of advance royalty. Many leases provide that if the minimum output is not mined in any one year the minimum royalty paid shall be applied on royalty accruing in subsequent years when more than the minimum tonnage is removed. The state lease does not."

It was held that, in the absence of a contract provision to that effect, the minimum payment for a given year when no ore, or less than the minimum is taken, cannot be applied on subsequently accruing royalties on ore taken in excess of the required minimum, and that the state lease did not permit such application to be made. The question decided was not one of statutory construction. It was one which called for the construction of a private contract and the determination of the relative rights of the parties thereto.

The word "royalty" as used in L. 1921, p. 274, c. 223, and in L. 1923, p. 258, c. 226, should be given the same meaning for the purpose of determining the tax imposed by each act. Under the earlier act, a tax of 6 per cent is imposed on the occupation of mining; under the later act, a tax of 6 per cent on the royalty paid to the fee owner; but the royalty paid to the fee owner is deducted in arriving at the basis for the computation of the occupation tax. The state does not get the royalty tax from both fee owner and mining company, and is not concerned in a controversy between the two, in which each seeks to shift the burden to the other. Chapter 226 is really complementary to chapter 223 and should be considered in construing and applying the earlier act. The two acts, together with the general tax laws of the state, cover the whole field of taxation of mining property.

In the present state of the record it is unnecessary to determine whether the whole or any part of the sum of $950,000 was in fact an advance payment of the royalty Kimberly was to receive. The lease shows on its face that the ore in the three mines differed in quality and that the tonnage in each mine was estmated. There is no evidence of the accuracy of the estimates. A witness who had no personal knowledge of the facts testified that Jones & Laughlin "allocated $337,024.90 to the Lincoln mine." It is impossible to say with any degree of certainty that the amount allocated is correct. Before the commission is required to deduct part of the lump sum paid to Kimberly as a royalty paid in advance, it must be shown that the amount so claimed is a fair percentage of the value of the ore in the three mines involved in the transaction. In the absence of a satisfactory showing that the amount allocated represented the proportionate value of the ore in the Lincoln mine and was paid for the privilege of working the mine and removing the ore, the commission was justified in disallowing this item of the relators' claim.

The Leetonia Mining Co. also claimed an allowance on account of a royalty paid in advance. That company is a subsidiary of the Jones & Laughlin Steel Corporation. The only evidence relative to the claim was given by an attorney in charge of tax matters for the Jones & Laughlin Steel Corporation. He testified that when the Leetonia mine was acquired $1,000,000 was paid; that the estimated deposit of ore was 8,605,806 tons, and that by dividing the sum paid by this tonnage and multiplying the quotient by the number of tons produced in 1924, it appeared that $23,708.53 had been paid as a liquidated advance royalty.

We are of the opinion that the evidence did not compel the commission to allow this claim. The particulars of the transaction in which the Leetonia mine was acquired are not given. The contract of purchase is not in evidence. No one who professed to have knowledge of the number of tons of ore in the mine was called to testify. The witness had no personal knowledge of the things mentioned in his testimony. He could not know that the whole of the payment was made for the ore. For aught that appears, other prop-

erty may have furnished part of the consideration. Such a claim cannot be established by hearsay evidence. The commission was justified in disallowing the claim for lack of competent evidence to establish it to any degree of certainty.

The commission treated each mine as a separate unit in determining the tax. The relators insist that this was wrong. They say in effect that whether a man operates one mine or a dozen his occupation is mining; that the tax is laid upon the occupation and not upon the ore produced; and that, if a mining company operates one of its mines at a profit and another at a loss, the net result of the operation of both must be taken as the basis for the determination of the tax. Under the commission's interpretation of the law, the tax is measured by the full value of the ore taken from a profitable mine, without taking into account ore taken from a mine operated at a loss. The relators would have the amount of the tax ascertained in the same manner as income taxes, and much can be said in favor of a construction of the statute which would sanction that method of procedure, but it is not permissible in view of the provisions of the statute.

The amount of the tax is determined by subtracting from the value of the ore at the place where it is brought to the surface, the cost of mining that particular ore and none other. The cost of stripping an open pit mine is spread over the tonnage uncovered in that mine and not over all the mines owned and operated by the same person. In an underground mine the cost of shafts and drifts is to be subtracted from the value of the ore taken from that mine. Open pit and underground mines are dealt with separately. There is no provision for charging the expense of development work done in one mine against another mine or the ore taken therefrom. Theoretically the occupation of mining is taxed, the tax being measured by the value of the ore, but the method of determining the tax is not substantially different from that which would be followed if the ore itself were taxed; practically the tax is a burden on the ore taken from each mine operated by the person taxed. Although the question is not free from doubt, we reach the conclusion that the

commission was right in treating the mines as separate units for the purpose of calculating the tax.

The views we have expressed are for the guidance of the commission in redetermining the amount of the tax. In some respects the commission erred; in others the statute was construed and applied correctly.

There must be a rehearing and the proceedings are remanded for such further action as may be necessary to give effect to the views expressed in this opinion.