# STATE EX REL. THE SHENANGO FURNACE COMPANY v. J. G. ARMSON AND OTHERS.[1]

July 22, 1927.

No. 25,724.

**What deduction from mining occupation tax may be made by owner of mining lease.**

1. The purchaser of a mining lease who mines and produces ore thereunder is entitled in the computation of the tax under the mining occupation tax statute, L. 1921, c. 223, to a deduction as advance royalty from the valuation of the ore produced, in addition to the rent or royalty reserved, of the amount paid for the lease whether by way of additional rent or royalty or by lump sum payment, following State ex rel. Inter-State I. Co. v. Armson, 166 Minn. 230.

**No advance royalties were paid by transfer of stock of mining company.**

2. Two mining leases were acquired by the relator by assignment along with other property upon its organization in 1906. It gave its assignor a mortgage upon the leases and transferred to it a part of its capital stock. Under the facts detailed in the opinion it is *held* that no payments constituting advance royalties were made at the time and the tax commission was right in refusing to deduct advance royalties from the value of the ore produced in administering the mining occupation tax law.

**When money for assignment of lease may be advance royalty.**

3. Money paid for the assignment of a lease is none the less advance royalty because the assignment is without condition and contains no right of re-entry.

Licenses, 37 C. J. p. 250 n. 69.

Certiorari to review the determination by the tax commission of relator's occupation tax for the year 1925. Writ quashed.

*Washburn, Bailey & Mitchell,* for relator.

*Clifford L. Hilton,* Attorney General, and *G. A. Youngquist,* Assistant Attorney General, for respondents.

[1]Reported in 215 N. W. 74.

DIBELL, J.

Certiorari to review the determination by the Minnesota tax commission of the occupation tax of The Shenango Furnace Company, the relator, for the mining operations of the year 1925. The tax commission refused to deduct from its valuation of the ore production of the Shenango and Webb mines so-called advance royalties which the relator claims it paid when it acquired assignments of leases of these mines along with the transfer of other property in 1906. Whether the commission erred in refusing to make the deductions claimed by the relator or deductions in some amount is the ultimate question.

1. The Shenango Furnace Company, the relator, owns the Shenango and Webb mines. There is another corporation, Shenango Furnace Company, earlier in organization and the predecessor in title of The Shenango Furnace Company. The only difference in their names is the word "The" in the later corporation; and we find it convenient to distinguish them as the old and the new.

The occupation tax statute, L. 1921, p. 274, c. 223, imposes "an occupation tax equal to 6 per cent of the valuation of all ores mined or produced," in addition to all other taxes. It provides for the deduction from such valuation of "the amount of royalties paid on the ore mined or produced during the year." The 1923 royalty tax statute defines royalty as "the amount in money or value of property received by any person having any right, title or interest in or to any tract of land in this state for permission to explore, mine, take out and remove ore therefrom." L. 1923, p. 258, c. 226, § 2. The occupation tax and the royalty tax are complementary. State ex rel. Inter-State I. Co. v. Armson, 166 Minn. 230, 207 N. W. 727; Lake Superior Con. Iron Mines v. Lord, 271 U. S. 577, 46 S. Ct. 627, 70 L. ed. 1093; Marble v. Oliver I. Min. Co. infra, p. 263.

The deduction of advance royalties was considered in State ex rel. Inter-State I. Co. v. Armson, 166 Minn. 230, 207 N. W. 727, and in State ex rel. Shenango F. Co. v. Armson, 166 Minn. 249, 207 N. W. 735. The latter case involved the Shenango and Webb mines

here involved. In both cases the right to deduct advance royalties was recognized, but it was held that the evidence did not require a finding by the tax commission that advance royalties were paid. In the first, referring to the meaning of royalty, the court [at 166 Minn. 238] said:

"As applied to a mine, the commonly accepted definitions of the word are: A share of the product or profit of the mine reserved by the owner for permitting another to use the property * * *; a payment made to the landowner by the lessee of a mine in return for the privilege of working it, * * *."

And again [at page 239]:

"Whether the lease obligates the lessee to pay a fixed sum upon the execution thereof or at a future date, or in instalments spread over a stated period of time, if the grant of the privilege of mining and taking the ore from the land is the consideration for the payments, they are royalties.

"Little importance should be attached to the form of the instrument granting the privilege, for neither the commission nor the court is bound to accept it for what it appears to be upon its face. By expressing their agreement in language appropriate to a contract of sale, the parties may not transform what was intended to be a lease into something else, or preclude the commission or the court from looking behind the form of the instrument to ascertain its true nature."

Money or value paid for the privilege of mining, though it may be paid in advance of the taking, is advance royalty within the occupation tax providing for a reduction for royalties paid. If the lessee under a mining lease carrying a 25-cent royalty assigns his lease at an advance of 10 cents per ton, and the assignee operates, he is entitled to a deduction of 35 cents per ton from the valuation of the ore produced. And if instead of an advance of 10 cents per ton he gives $50,000 as the consideration of the assignment, and operates, he is entitled to a deduction of 25 cents per ton from the

valuation of the ore produced and an additional deduction, by some proper method, based on the $50,000 paid as part compensation for the privilege of working the mine. All this was decided in the two cases cited. The excuse for repetition is the insistence of counsel that advance royalty is not what we held it to be.

2. The question next to be considered is whether the relator paid compensation additional to the rent or royalty reserved constituting advance royalty which should have been deducted in computing the occupation tax.

The history of the Shenango lease is as follows: In 1900 Rahilly, the fee owner, leased to Kinney and Howe at a 20-cent royalty. In 1901 Kinney and Howe assigned to the Shenango Iron Mining Company. In 1902 the Shenango Iron Mining Company assigned to the old Shenango Furnace Company.

The history of the Webb lease is as follows: In 1902 Hull, the fee owner, leased to Hill at a 25-cent royalty. In 1902 Hill assigned to Fay. In 1902 Fay assigned to the old Shenango Furnace Company.

The old company continued its ownership of the leases until along with other mining property they became the property of the new Shenango company in the early part of 1906. When title to the two leases passed to the old Shenango no advance royalty, so far as the record discloses, was paid or had been paid. Besides the Shenango and Webb mines, the old company owned the Whiteside mine in Minnesota, one-half of the stock of the Antoine Ore Company of Michigan, the Shenango furnace properties in Pennsylvania, coal property in Pennsylvania, and stock in the Lake Erie Limestone Company. These properties passed to the new company along with the Shenango and Webb leases.

The stock of the old Shenango company consisted of 6,000 shares. W. P. Snyder owned 3,000 shares and the Oliver & Snyder Steel Company, a corporation, 3,000 shares. Henry W. Oliver and his associates owned the stock of that corporation. To acquire its 3,000 shares in the old Shenango, and so become the owner of all the stock, Snyder, on December 15, 1905, proposed to the company

to purchase its 3,000 shares at $1,666.66 2/3 per share, or $5,000,000, of which $1,000,000 was to be paid on January 1, 1906, and $4,000,000 was to be paid by the issuance of $4,000,000 in 5 per cent 15-year bonds of the old Shenango secured by a trust deed to the Union Trust Company of Pittsburgh. It was a part of the proposal that the Snyder & Oliver company would discharge a debt of $600,000 which was owing it from the old Shenango. The Snyder & Oliver company accepted the proposition, Snyder on January 4, 1906, gave it his check for $1,000,000, it was paid, and the Snyder & Oliver company deposited its 3,000 shares of the old Shenango stock in escrow with the Union Trust Company of Pittsburgh to be delivered to Snyder when the $4,000,000 of old Shenango bonds were deposited. In the escrow receipt, dated January 4, 1906, it was stated that the bonds of a new corporation might be taken in lieu of the bonds of the old Shenango provided the new corporation took over all the assets of the old Shenango. This is the first mention we note of a new corporation. Soon afterwards and in January, 1906, The Shenango Furnace Company was incorporated. Its capital stock was $10,000, all owned by Snyder.

If the transaction had been completed strictly in the manner contemplated there would be no question of an advance royalty. None would be claimed. It would have been a stock purchase resulting in an absolute control of the old Shenango by Snyder through stock ownership. There would not have been even a nominal transfer of the corporation property. Control through corporate ownership is not individual ownership of corporate property. Baldwin v. Canfield, 26 Minn. 43, 1 N. W. 261, 276; State v. C. & N. W. Ry. Co. 133 Minn. 413, 158 N. W. 627. The transaction was carried out a little differently. On January 24, 1906, Snyder proposed to the new Shenango "to convey, or cause to be conveyed" to it all the property of the old Shenango, subject to its current liabilities, as of January 1, 1906, except a debt of $600,000 to the Oliver & Snyder Steel Company, the debt mentioned in the original contract whereby Snyder acquired the 3,000 shares of the old Shenango, and except a debt of $800,000 owing to W. P. Snyder & Company,

both of which he agreed to have discharged. The new company was to increase its capital stock to $5,000,000 and issue to him or as he should direct all of the increase as fully paid, giving him all of the $5,000,000 stock, and issue to him or as he should direct $4,000,000 in bonds, secured by a trust deed to the Union Trust Company, covering all the property of the new company.

On the same day Snyder proposed to the old Shenango that if it would transfer all of its property as of January 1, 1906, to the new Shenango, he would cause it to accept the same and assume all its obligations, except the two items of $600,000 and $800,000; and in the event of the acceptance of the proposition he agreed to discharge the two items, and cause to be transferred to the old company $2,600,000 of the stock of the new Shenango.

On January 25, 1906, a meeting of the board of directors of the new Shenango was held. The old Shenango was represented by its vice-president. The plan proposed by Snyder was accepted. Deeds and transfers of all the property of the old Shenango were presented and accepted. Provision was made for the issuance of $4,000,000 in bonds "to W. P. Snyder, or as he shall direct, and in performance of this company's contract with him in relation to acquiring the property and assets of the Shenango Furnace Company" and for the delivery of the increase of stock from $10,000 to $5,000,000 to "W. P. Snyder, or as he shall direct."

We find nothing in the passing of the title of the various properties from the old Shenango to the new on which to base a claim of reduction for advance royalties. The Oliver interests got just what they were to get under the first plan. Snyder gave no more. It was found convenient to use a new corporation instead of letting the title remain in the old one. We may not know all the facts. Those mostly interested in a financial way have died since. We do not have all the details. It may have seemed a little unusual that Snyder, owning half the stock of the old Shenango, should acquire the other one-half and cause the old company to issue bonds in payment of four-fifths of the purchase price—a striking instance of a lack of consideration passing to the old company for the issu-

ance of $4,000,000 of its bonds. Anyway, a new corporation was organized and Snyder was the owner of all the stock in each. It is not entirely clear why $2,600,000 in stock was delivered to the old Shenango. Nor is it particularly important, for Snyder owned all of the old Shenango stock as he did all the stock of the new Shenango.

In State ex rel. Shenango F. Co. v. Armson, 166 Minn. 249, 207 N. W. 735, the relator's occupation tax for the operation of the Shenango and Webb mines in 1924 was involved. The principles controlling the payment of advance royalties were considered at length. It was held that the evidence was not such as to require a finding by the tax commission of the amounts properly allocated to the Shenango and Webb leases when title to the various properties passed from the old to the new. It appears that in the negotiations between the Oliver interests and Snyder relative to the value of the old Shenango properties there was some controversy over values. Snyder put the value at $10,000,000 and the Oliver interests claimed it was much greater. The Snyder valuation was taken as the basis of the transfer. In the light of subsequent developments it was conservative. The $4,000,000 of bonds have been paid and the stock has multiplied in value. It is conceded by counsel for the commission that the evidence is such as to permit a fair determination of the proper allocation to each of the leases of its proportion of value going to the new company. The relator claims that the Shenango lease was of the value of $4,500,000 and the Webb lease of the value of $2,125,000. These amounts were in excess of the 20 and 25 cent royalty values. In the former case we did not hold that the transactions in 1905 and 1906 which resulted in Snyder's advancing money, acquiring all of the stock in the old Shenango, organizing the new Shenango in which he owned all the stock, and passing title to the properties of the old Shenango to the new constituted a payment of advance royalties on the Shenango and Webb leases, and that, as now argued by the relator, there remained for the commission only to allocate the amounts properly to be allocated to the Shenango and Webb leases and therefrom fix

the amount of advance royalties. Whether the transactions we have noted resulted in the payment of advance royalties is now presented for necessary decision and we hold that they did not.

3. The state contends that a claim for advance royalty cannot be predicated upon a payment made for an assignment of a lease when there is no condition and no right of re-entry. With this contention we do not agree. We have held and again hold that money paid for the permission to remove iron ore is royalty within the occupation tax statute and form is not controlling. State ex rel. Inter-State I. Co. v. Armson, 166 Minn. 230, 207 N. W. 727. A lump sum given upon the purchase in addition to the rent or royalty reserved is advance royalty. It is as much deductible as if measured by a stated advance per ton over the reserved rent or royalty. There may be many situations not now foreseeable where the question of advance royalty will be involved, and we refrain from further discussion; but there is no need of further controversy based on the claim that there can be no advance royalty where there is a straight assignment of a lease without condition or right of re-entry.

Writ quashed.