# OLIVER IRON MINING COMPANY v. COMMISSIONER OF TAXATION.

76 N. W. (2d) 107.

March 23, 1956—No. 36,549.

*Miles Lord,* Attorney General, and *George R. Johnson,* Assistant Attorney General, for relator.

*Donald D. Harries, Franklin B. Stevens,* and *William H. Crago,* for respondent.

NELSON, JUSTICE.

The case before us concerns the administration of the occupation tax on mining of iron ore in Minnesota under M. S. A. c. 298 and the method of assessment against the Oliver Iron Mining Company for the year 1946. The Oliver Iron Mining Company, respondent herein, will hereinafter be referred to as the taxpayer; the commissioner of taxation, relator herein, as the commissioner; and the Board of Tax Appeals as the board.

The occupation tax returns involved here were filed by taxpayer and thereafter a hearing was held before the commissioner at which many of the issues later raised before the board were presented. Certain adjustments not here in issue were made by the commissioner, and this was followed by a final assessment of the occupation tax on May 29, 1947, against taxpayer's mines in the aggregate sum of $5,060,905.24. On June 13, 1947, taxpayer paid to the state treasurer $4,745,614.19, in addition to $155,350.34 already credited to the tax, but withheld payment of the sum of $159,940.71, the latter sum being the item here in controversy. Thereafter the taxpayer appealed to the board. At the time taxpayer appealed to the board, certiorari was taken to this court. What amounted to a "double appeal" was brought about because of doubt at that time as to the proper review procedure created by a new revision in the statutes

of the state. The procedural question was determined by the Supreme Court by order dated November 6, 1947. It was determined that the proper method of reviewing determinations of the commissioner in occupation tax matters was by an appeal to the Board of Tax Appeals. The matter came on for hearing before the board de novo, and on October 25, 1954, it entered its order reversing the commissioner's order with respect to the amount in controversy.[1]

The hearing held following taxpayer's appeal to the board presents a lengthy record; matters were gone into fully on both sides; numerous exhibits were offered and received together with expert testimony presented on behalf of both sides. The findings made and entered by the board were based upon the evidence produced and the proceedings had before it as disclosed by this record.

The voters of this state on November 4, 1922, adopted Minn. Const. art. 9, § 1A, and upon the authority of that provision, what is now M. S. A. c. 298 was passed by the legislature providing for a tax to be levied upon the occupation of mining iron ore. See, M. S. A. 1945, §§ 298.01 and 298.03.[2]

---

[1]See, M. S. A. 271.06, subd. 6.

[2]M. S. A. 1945, § 298.01. "Every person engaged in the business of mining or producing iron ore or other ores in this state shall pay to the state of Minnesota an occupation tax equal to 10½ per cent for the years 1945 and 1946, and nine per cent each year thereafter of the valuation of all ores mined or produced, which said tax shall be in addition to all other taxes provided for by law, said tax to be due and payable from such person on May 1 of the year next succeeding the calendar year covered by the report thereon to be filed as hereinafter provided. All ores mined or produced subsequent to December 31, 1944, shall be subject to the increased rate provided by this section."

M. S. A. 1945, § 298.03. "The valuation of iron or other ores for the purposes of determining the amount of tax to be paid under the provisions of section 298.01 shall be ascertained by subtracting from the value of such ore, at the place where the same is brought to the surface of the earth, such value to be determined by the commissioner of taxation:

"(1) The reasonable cost of supplies used and labor performed at the mine in separating the ore from the ore body, including hoisting, elevating, or conveying the same to the surface of the earth;

"(2) If the ore is taken from an open pit mine, an amount for each ton

The taxpayer at that time brought an action to restrain the Tax Commission from assessing the tax upon the ground that the tax was in conflict with the commerce clause and equal protection clause of the United States Constitution and also in violation of Minn. Const. art. 9, § 1, which requires that "Taxes shall be uniform upon the same class of subjects." The Supreme Court of the United States upheld the tax against the constitutional objections upon the ground that the tax was just what it purported to be—a tax upon the occupation of mining iron ore. In that case, Oliver Iron Co. v. Lord, 262 U. S. 172, 176, 43 S. Ct. 526, 528, 67 L. ed. 929, 935, the court in discussing the nature of the occupation tax said:

"* * * We think the tax in its essence is what the act calls it— an occupation tax. It is not laid on the land containing the ore, *nor on the ore after removal,* but on the business of mining the ore, which consists in severing it from its natural bed and bringing it to the surface where it can become an article of commerce and be utilized in the industrial arts." (Italics supplied.)

In the later case of State ex rel. Inter-State Iron Co. v. Armson, 166 Minn. 230, 242, 207 N. W. 727, 732, this court said: "The amount

of ore mined or produced during the year equal to the cost of removing the overburden, divided by the number of tons of ore uncovered, the number of tons of ore uncovered in each case to be determined by the commissioner of taxation;

"(3) If the ore is taken from an underground mine, an amount for each ton of ore mined or produced during the year equal to the cost of sinking and constructing shafts and running drifts, divided by the number of tons of ore that can be advantageously taken out through such shafts and drifts, the number of tons of ore that can be advantageously taken out in each case to be determined by the commissioner of taxation;

"(4) The amount of royalties paid on the ore mined or produced during the year;

"(5) A percentage of the ad valorem taxes levied for such year against the realty in which the ore is deposited equal to the percentage that the tons mined or produced during such year bears to the total tonnage in the mine; and

"(6) The amount or amounts of all the foregoing subtractions shall be ascertained and determined by the commissioner of taxation."

of the tax is determined by subtracting from the value of the ore *at the place where it is brought to the surface, the cost of mining that particular ore and none other,"* (italics supplied) and in that opinion the court further held that in determining the occupation tax *each mine must be treated as a separate unit.*

■ In Miller v. Commr. of Taxation, 240 Minn. 18, 59 N. W. (2d) 925, we recently emphasized that the function of this court in reviewing a decision of the Board of Tax Appeals is to determine whether there is sufficient evidence to support the decision. In Western Auto Supply Co. v. Commr. of Taxation, 245 Minn. 346, 365, 71 N. W. (2d) 797, 809, following Stronge & Lightner Co. v. Commr. of Taxation, 228 Minn. 182, 36 N. W. (2d) 800, this court said:

"The commissioner of taxation must of course guard against being arbitrary or capricious. When the provisions of the statute are clear, he must follow the statute. Having followed and complied with the statute, his determination must stand, under the prima facie validity rule, even though his method may not have produced the most equitable or the most accurate reflection of apportionable income, unless the taxpayer has sustained the burden of showing either the incorrectness or the invalidity of the tax."

In each of those cases a writ of certiorari was issued by this court to review a decision of the board. In Western Auto Supply Co. v. Commr. of Taxation, *supra,* we said, emphasizing the general rule enunciated in State ex rel. Inter-State Iron Co. v. Armson, *supra,* that it is well settled that, in reviewing an order or determination of an administrative board, this court will go no further than to determine: (1) Whether the board kept within its jurisdiction; (2) whether it proceeded on a correct theory of the law; (3) whether its action was arbitrary, oppressive, or unreasonable and represented its will and not its judgment; and (4) whether the evidence was such that it might reasonably make the order or determination in question. So, it seems clear at the outset that the question before this court in the present controversy is whether, assuming the board

had jurisdiction and proceeded upon authority of law, the decision it rendered finds support in the evidence.

The commissioner contends that the board erred in reversing his order of May 29, 1947, increasing the value of the ore mined from $132,772,441.05 to $134,337,809.63 and holding on appeal that the occupation tax liability of taxpayer for the calendar year of 1946 was $159,940.71 less than the assessment; that the board erred in their determination of the value of the iron ore mined by the taxpayer in the year 1946 in an amount less than that computed by the commissioner; that the board erred in giving consideration to the past practice in filing occupation tax returns which had prevailed since 1923; that such past practice was in no way binding upon the commissioner; and that it erred in failing to find and determine that the taxpayer did not produce at the mouth or surface of its mines the various grades of ore it purported to report on its occupation tax returns. It is further contended that the board committed other error in failing to determine that there was no basis or justification either in fact or in law for the taxpayer's reclassification or regrading of tonnages of ores within the classifications of Bessemer, non-Bessemer, manganiferous, and lump grades and thus failing to find that the tax returns filed by taxpayer did not fairly and properly reflect the value of the ores produced by it at the mouth of each of the mines.

Taxpayer contends that the state has not in fact valued the ore mined at the place where the same is brought to the surface of the earth; that the occupation tax law, which is here involved, is confined to taxing the value of the ore at the mouth of the mine; and, in any event, that that is the law which the legislature enacted, and which was deemed by it to be the most desirable method from the state's standpoint in enabling it to meet the tax requirements of the uniformity clause of our state constitution and avoiding conflict with the commerce clause of the Constitution of the United States which might otherwise jeopardize the constitutionality of the whole tax.

Taxpayer places reliance on the fact that originally the Tax Commission, following the enactment of the occupation ore tax statute,

first prepared its forms to provide for valuing 3 types of ore at the surface of the mine; namely, Bessemer, non-Bessemer, and manganiferous ores. After objection by taxpayer and reconsideration, the state acquiesced in valuing the several grades of Bessemer and non-Bessemer ores produced at the taxpayer's mines, continuing that method until the 1946 assessment when the commissioner reverted to the method which the Tax Commission had abandoned at the inception of the act for taxpayer's method. Taxpayer argues that it thus appears that, before giving the matter the fullest consideration, the first tentative approach was to use the 3 grades of ore and another classification known as lump ore. The Tax Commission, however, rejected this approach and made its first administrative interpretation on the basis of interpretation approving taxpayer's method of classification and grading as to Bessemer, non-Bessemer, and manganiferous ores, and it is disclosed by the Minnesota Tax Commission report of 1924, p. 103, that the commission had given it due consideration, for this statement may be found in the report: "As already stated, every reasonable doubt was resolved in favor of the State in computing the tax."

The taxpayer at that time submitted to the Tax Commission on forms prepared by itself a report of the operations for the years 1921 and 1922, and this furnished a background for the commission's consideration. While the interpretations made at that time and the practice followed thereafter may not be binding upon the commissioner, nevertheless, having been followed and acquiesced in for the number of years which the record reveals, it is persuasive in the factfinding field. State ex rel. Inter-State Iron Co. v. Armson, 166 Minn. 230, 242, 207 N. W. 727, 732, followed in 1926 laying down the rule that "the tax is determined by subtracting from the value of the ore at the place where it is brought to the surface, the cost of mining that particular ore and none other" and that "for the purpose of determining the tax, each mine operated is to be treated as a separate unit, although several are operated by the same company." This court in that opinion said (166 Minn. 243, 207 N. W. 732): "The views we have expressed are for the guidance

of the commission in redetermining the amount of the tax." The taxing authorities and the legislative committees of the house and the senate, who over the years gave consideration to the mining and taxing of iron ore, were undoubtedly familiar with the decisions in Oliver Iron Co. v. Lord, *supra,* and State ex rel. Inter-State Iron Co. v. Armson, *supra.*

■ Taxpayer argues that in the manufacture of steel various grades of iron ore are required and that these grades of ore consist of varied chemistry and different structure, and because of these requirements taxpayer has found it necessary to prepare for the market various grades of iron ore which will meet the demand of being usable by and acceptable to the purchaser. Therefore, it being the largest producer of iron ore in Minnesota, it has over a period of many years produced several classifications or groups of ore within the three general classifications. This grading and grouping proved necessary in order to meet blast furnace requirements in the making of the various types of steel. The taxpayer contends that there are several types or grades of ore contained within the broad classifications of Bessemer and non-Bessemer ores which have a distinctive chemistry construction which differentiates them from other ores within the same broad classification and that this difference determines the particular utility of each type of ore used in the steelmaking process. These various types or grades of ore are used for different purposes as well as different processes in steelmaking, and the classification into several grades within each of the general classifications is essential to carrying on taxpayer's business of mining iron ore. These several grades are purchased by different customers in varying ratios, and contrary to the averaging of grades arbitrarily indulged in by the state, the several types of ore produced by taxpayer are kept separate by the purchasers of such ores to the end that they may be charged into the furnaces in varying proportions. The taxpayer therefore contends that the industry practice of selling penalty ores is well established but that the penalty ores would be destroyed by the state's arbitrary averaging technique. Taxpayer contends that during 1946 it sold to customers, not in any

way affiliated with it, more than 1/5 of its total production of the iron ore; that a substantial portion of the ore so sold was penalty ore; that by reason of the state's averaging technique, many of these penalty ores were not recognized in the state's valuation in the assessment of the 1946 tax, and as a result it suffered a silica penalty loss of $204,337.92 and a penalty loss on all ores in 1946 in the sum of more than $1,500,000. It is the further contention of taxpayer that it suffered silica penalties far in excess of the additional tax assessed against it by the commissioner for the year 1946, and this without consideration of the correlative iron penalties. This, it claims, demonstrates the reality of the pricing system adopted and followed and establishes the arbitrary character of the state's disregard of that system by its averaging technique designed to recover value for the state. Taxpayer asserts that the value applied by the commissioner never, in fact, existed where the ore is brought to the surface of the earth, which is where the statute provides that it must be valued.

All Lake Superior ores have for years been valued on what is known as the Lake Erie price formula. The validity of the Lake Erie price is not in issue in this case. It is well recognized that there has developed a point of reference for expressing the price of a given ton of ore. This takes into account the variations in analysis inherent in the various ores. The point of reference for Lake Superior ores is $51\frac{1}{2}\%$ iron, and in 1946 the Lake Erie price for Mesabi non-Bessemer ore was $5.05 per ton for ore containing not less than $51\frac{1}{2}\%$ iron and not more than 10% silica. The value is ascertained in terms of unit value which is the result of dividing 5.05 by $51\frac{1}{2}\%$ resulting in $.09806 per unit. In determining the value of a ton of ore, it is only necessary to multiply the iron content of the ore by that unit value. The base value of the iron ore mined is subject to adjustment, however, by recognized premiums and penalties. For ore having an iron content of less than 50% but not less than 49%, the penalty is $\frac{1}{2}$ of one unit value. For iron content below 49%, the penalty is a full unit. For each 1% of silica above 10% there is deducted a silica penalty of 7 cents. In the case of Bessemer ores,

it is customary to add to the base value a premium for guaranteed phosphorous below .045%, and this premium is progressive by $.005 for each .001% decrease so that for the first .001% decrease below .045%, it is $.008; for the second .001% decrease, it is $.0085; and for the third .001% decrease, it is $.009, etc. There are other elements which enter into the determination of the value of a ton of iron ore, but these are not involved in this proceeding.[3]

In the application of the Lake Erie price there are deducted certain transportation costs to determine the value of the ore at the

---

[3]The following examples illustrate the determination of the value of a ton of ore. Assume a ton of non-Bessemer ore having an iron content of 52% and silica content of 10%, the value of this ton would be computed in the following manner:

| | |
|---|---|
| Unit value of ore | $ .09806 |
| iron content of ore (%) | ×52 |
| Base value per ton | $ 5.09912 |

and to illustrate the application of penalties, assume a ton of non-Bessemer ore with an iron content of 48% and a silica content of 12%, the value of this ton would be arrived at as follows:

| | | |
|---|---|---|
| Unit value of ore | $ .09806 | |
| iron content of ore (%) | ×48 | |
| Base value per ton | $ 4.70688 | |
| less penalty of 1/2 unit for iron content from 50% to 49% | | |
| 1/2 × $.09806 | $ .04903 | |
| less penalty of one unit for iron content from 49% to 48% | | |
| 1 × $.09806 | $ .09806 | |
| | $ .14709 | $ .14709 |

| | |
|---|---|
| Value per ton | $ 4.55979 |

less penalty for silica content in excess of
   10% at 7 cents per 1%

2 × 7: 14 cents

| | |
|---|---|
| Net value per ton: | $ 4.41979 |

The market price of ore in 1946 was the Lake Erie price which also was the legal O.P.A. price.

mouth of the mine and there are also certain specific statutory deductions under § 298.03 which must be applied in order to arrive at the value for occupation tax purposes. Such deductions are not in question in this case. Analysis of ores varies greatly on the Mesabi range, the record indicating that iron varies from 49% to 67% or higher, phosphorous from 15/1000 of 1% to .150% or higher, silica from 1% to 25% and manganese from .1 of 1% to 20%.

The taxpayer in the light of its own needs, which appears to be from 75% to 80% of its production and its contract commitments, has grouped all of its production into 14 grades. These are divided between Bessemer, non-Bessemer, manganiferous and lump ores. In fact, it produces 5 grades of Bessemer ore, 7 grades of non-Bessemer ore, 1 of manganiferous ore, and 1 of lump ore. Many of taxpayer's mines produced only 1 or 2 grades of ore, as for example, the Canton, Iron Chief, and Sauntry mines produced 1 grade of Bessemer and 1 grade of non-Bessemer; the Duluth mine produced a single grade of non-Bessemer; the Fraser, Glen, Morrison, Mountain Iron, Niles, and Spruce-Adams mines produced only 2 grades of Bessemer plus several grades of non-Bessemer; the Gross-Marble, Hartley, Arcturus, and Pioneer mines produced only 1 grade of Bessemer plus several grades of non-Bessemer; the Leonard Slope, Pillsbury, Leonard Fee, Morris, Fayal Fee, Fayal Lease, Godfrey, and Sibley mines produced no Bessemer but several grades of non-Bessemer; and, the Sharon mine produced only 2 grades of non-Bessemer. Many of the small operators produce only 1 or 2 grades of ore.

The record indicates that no mine operated by taxpayer produced more than a single grade of manganiferous ore, whereas a number of other operators produced and reported multiple grades of such ore. Taxpayer argues that no distinction based on the method of reporting for occupation tax purposes can be drawn between the various mining companies since it is an obvious fact that the types of ores produced from Minnesota mines vary widely from mine to mine and from company to company and that each company reports just those types of ore which its business judgment and the nature of the mines it operates indicate should be produced from a given

mine. No matter how we view the evidence submitted, neither the commissioner's findings nor the board's findings and decision present a pattern fashioned according to a rule of clearcut law but one lifted, mostly, out of the field of fact and the experience and the theories to be gathered from the evidence.

Both sides in a lengthy record submit reams of expert testimony by chemical and mining engineers as well as experts in the handling, shipping, selling, and processing of iron ore. The method of grading and grouping of various ores taxpayer used in 1946 was the same method it had used since 1923 with approval from the taxing authorities. Taxpayer contends that no change has been made in the occupation tax law which would justify any change in administrative procedure, nor has the legislature seen fit to change the law except in those instances where it may have changed percentages. One of the experts testifying for commissioner termed the state's method of grading to arrive at the 1946 tax a new "interpretation of the value not of the law." This seems to have been prompted because taxpayer had expanded its grading and grouping of grades of ore in practice and on its returns. On recommendations made by department experts, the old plan, initiated by the Tax Commission originally and then discarded as to taxpayer, of reporting 1 grade of Bessemer, 1 grade of non-Bessemer and manganiferous and lump ores was adopted. Apparently this method was revived because it was thought that the state was losing value that ought to be obtained for it. The record indicates that this change was adopted upon the theory that ultimately the ore will be blended for use at the blast furnaces, contending that the value was there all the time even when brought to the surface at the mines. While testifying respecting this blending or mixture of the ores, Mr. Howard McAdams was asked by counsel for taxpayer:

"Q. So the value you are calculating is the value it has as it is put into the furnace then?

"A. The value that the ore has, yes."

He felt "it was only fair we at last get that part of the value that is ultimately blended, of ore of that one mine."

The last series of questions and answers elicited on cross-examination are to the same effect:

"Q. In other words, Mr. McAdams, you feel that because the Oliver Company mixes ores from the Hull Rust and the Fraser Mine and the Morris Mine and perhaps creates a higher value, there is something unfair about that and the state should be able to tax that value that is created when mixed at the docks?

"A. . I felt there should be some change made in that way of figuring the ore, yes. That is not meant as any reflection upon the Oliver people. The Oliver people had that grouping system and it probably was a very natural result to use your method of grouping but when you figured other companies that had no such grouping system or were not in a position to keep their groups in the manner you did, getting no particular benefit from—rather, not being able to avail themselves of eliminating some of these silica values—

"Q. In other words, you felt it was an unfair difference between the Oliver Company, in keeping their ores separate to the docks and through the docks to the furnace, whereas other companies mixed theirs at the mine?

"A. That was one of the reasons, yes.

"Q. And you figured the State should be able to tax that value that resulted when these ores were ultimately blended in the furnaces?

"A. Apparently, yes."

Taxpayer claims that the mixing of the various grades of ores is done at the lower lake ports and points where delivered for use in the blast furnaces and is effected entirely while the ore is being transported in interstate commerce and at considerable added expense to the taxpayer. The grading is done near the surface of the mines and in the railroad interchange yards in the vicinity of the mines and before the ore shipments enter the field of interstate commerce. Taxpayer contends that it is entitled to have the value fixed upon the various grades reported as the ore comes to the surface and before it is shipped and not after it has entered the field of interstate commerce.

In the appendix to the commissioner's brief, counsel observes that there is no definition of value set up by the legislature but that rather the determination of value is left to the administrative discretion of the tax commissioner; that there is therefore nothing in the statute constituting an ambiguity and nothing therein which might create any legal confusion. Counsel for commissioner further states that the question of value with regard to occupation taxes on ore (in common with most other taxes) is a question of fact, that "thus, the method used of determining value, that is, the method used in fixing a fact question is not interpretative of the meaning of the statute." See 17 Dunnell, Dig. (3 ed.) § 8952, wherein among other things it is stated that "The practical construction placed on a statute by administrative or executive officers is not controlling if the meaning of the statute is clear."

However, meaning derives vitality from application, and although the statute is clear that the legislature laid an occupation tax on the business of mining iron ore at the place where it is brought to the surface of the earth—the value of that particular ore and none other—, it is subject to interpretation as to the initial prices which are used in determining taxable prices. It has been held that in the construction of a doubtful and ambiguous law, the contemporaneous construction of those who were called upon to act under the law, and were appointed to carry its provisions into effect, is entitled to very great respect. Mr. Justice Cardozo speaking for the court in Norwegian Nitrogen Co. v. United States, 288 U. S. 294, 315, 53 S. Ct. 350, 358, 77 L. ed. 796, 807, said that:

"* * * administrative practice, consistent and generally unchallenged, will not be overturned except for very cogent reasons if the scope of the command is indefinite and doubtful. * * *. The practice has peculiar weight when it involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new."

This rule finds application in the long-continued administrative practice in the valuation of taxpayer's ore that had its beginning in 1923.[4]

In Davis, Administrative Law, § 56, the author says:

"* * * Courts tend to give extra weight, often approximating 'force of law,' in various situations, three of the most important being: (1) when the administrative interpretation was made contemporaneously with the enactment of the statute by those who may have been familiar with the legislative intent, (2) when the administrative interpretation is of long standing, and (3) when the statute has been reenacted. These and other factors appear in the cases in nearly all possible combinations; they are separated here only for convenience of discussion."[5]

The state contends that it was at no time necessary to change the statute but that a change of the method in valuing iron ore may be necessary; that, since the statutes here involved have always read as they now read with reference to fixing a tax on mining iron ore based upon value at the surface of the mine, the administrative duties performed by the commissioner in valuing the ore and fixing the tax in the first instance involved fact issues and fact questions—thus no rules of statutory interpretation, construction, or application are involved. Counsel for relator says "Our question here is simply a fact question."

If, as argued in behalf of the commissioner, the value of ore at the mouth of the mine is simply a fact question for his determination, which carries with it prima facie validity in the first instance, then it remains a question of fact when the matter is heard on appeal de novo before the Board of Tax Appeals, which tribunal makes the determination on the whole evidence submitted to it at a later, independent, and separate hearing, making its findings and finally rendering its decision. In the final analysis, after considering

[4]See, Bowles v. Seminole Rock Co. 325 U. S. 410, 65 S. Ct. 1215, 89 L. ed. 1700.

[5]See, also, Davis, Administrative Law, §§ 57 and 58; contra: Trust of Bingham v. Commissioner, 325 U. S. 365, 65 S. Ct. 1232, 89 L. ed. 1670, 163 A. L. R. 1175.

the applicable statutes and the record before us, we are impelled to reach the conclusion that it is for the Board of Tax Appeals in a de novo hearing to exercise its own judgment, decide the ultimate fact issues, and render its decision accordingly.

■■■ Our review of a decision of the Board of Tax Appeals is limited to those grounds specified in M. S. A. 271.10.[6] A decision of the commissioner of taxation, in case of appeal as provided by statute to the Board of Tax Appeals, comes there with prima facie validity. If no appellant appears, the board must affirm. If appellant does appear, the case is tried de novo, which means that either party may introduce evidence, and the findings and decision of the board are thereafter based upon all the evidence introduced and placed before it. Section 271.06 provides that the board shall hear, consider, and determine *every appeal de novo* upon the issues made by the notice and the return. Section 271.07 provides that the board shall provide for a verbatim stenographic report of all proceedings had before the board upon appeal in like manner as required by the laws relating to proceedings in district court, so far as applicable. Section 271.08 provides that the board shall determine every appeal by written order containing findings of fact and the decision of the board therein, and that a memorandum of the grounds of the decision shall be appended. It also provides for a certified copy of the order which shall be transmitted to the commissioner of taxation and filed in his office. Section 271.09 providing for appeals and reviews states in what cases the appeal to the Board of Tax Appeals shall be the exclusive remedy for reviewing the action of the commissioner of taxation respecting any tax, assessment, or other obligation.[7]

---

[6]M. S. A. 271.10, subd. 1. "A review of any final order of the board of tax appeals may be had upon certiorari by the supreme court upon petition of any party to the proceedings before the board. Such review may be had on the ground that the board was without jurisdiction, that the order of the board was not justified by the evidence or was not in conformity with law, or that the board committed any other error of law."

[7]M. S. A. 271.11 provides when orders shall be prima facie evidence of facts.

In Village of Aurora v. Commr. of Taxation, 217 Minn. 64, 14 N. W. (2d) 292, this court said that, in reviewing an order or determination of administrative board, the court will go no further than to determine whether the evidence was such that it might reasonably make the order or determination in question. Citing State v. Oliver Iron Min. Co. 198 Minn. 385, 270 N. W. 609; State ex rel. Inter-State Iron Co. v. Armson, *supra;* Chellson v. State Div. of Emp. & Sec. 214 Minn. 332, 8 N. W. (2d) 42; Bowman v. Troy Launderers & Cleaners, Inc. 215 Minn. 226, 9 N. W. (2d) 506.

In Duluth-Superior Dredging Co. v. Commr. of Taxation, 217 Minn. 346, 14 N. W. (2d) 439, this court said:

"A decision of the board of tax appeals will not be disturbed if it has a reasonable basis in the law."

Citing Village of Aurora v. Commr. of Taxation, *supra.* In Village of Hibbing v. Commr. of Taxation, 217 Minn. 528, 532, 14 N. W. (2d) 923, 925, this court said:

"All questions of law and fact are to be viewed by us in the light of the rule that a decision of the board of tax appeals will not be disturbed if it has any reasonable basis in law."

In Stronge & Lightner Co. v. Commr. of Taxation, *supra,* this court made it clear that our review of a decision of the board of tax appeals is limited to those grounds specified in M. S. A. 271.10. In that case consideration was given to the fact that this court in Duluth-Superior Dredging Co. v. Commr. of Taxation, *supra,* had held that the limitations imposed upon our review is similar to that imposed upon the circuit court of appeals in reviewing decisions of the U. S. Board of Tax Appeals or the later tax court citing and following Dobson v. Commr. of Int. Rev. 320 U. S. 489, 64 S. Ct. 239, 88 L. ed. 248. The same reasoning had been applied in the Aurora case.

In the Stronge & Lightner Co. case, however, we said (228 Minn. 193, 36 N. W. [2d] 806):

"That the Minnesota statute did not limit review as narrowly as was done by the Dobson case seems evident from an examination of

our statute. The words 'justified by the evidence' in our statute are not synonymous with 'warrant in the record,' nor consistent with the statement that (320 U. S. 501, 64 S. Ct. 246, 88 L. ed. 256) 'the judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body,' the rule established by the Dobson case. If our statute is not a declaration of the law as it existed prior to the establishment of the board of tax appeals, it is at least as broad as that rule." Citing State ex rel. Inter-State Iron Co. v. Armson, *supra.*

The decision of the Board of Tax Appeals may or may not be based upon the same evidence as the commissioner had.

■ Tested by all these rules, the determinative question now before us is whether the decision of the Board of Tax Appeals finds justification in the evidence. That it is in conformity with law, if it is justified by the evidence, would rarely be questioned in view of the fact that the primary or specific method prescribed by the legislature has been used and followed herein. This court has not heretofore and cannot now lay down any definite rule that will apply to all cases where similar appeals are taken and reviews followed by this court. The facts must be more or less determinative, within the limits of fair human judgment as applied to the facts and the issues in each particular case. It is apparent from the memorandum of the board attached to its findings that it carefully considered this case and gave all the testimony throughout thorough consideration. We are not permitted to substitute our judgment on the facts for that of the board. It is the trier of fact, it determines the probative value of the testimony. That is its prerogative and not ours, subject only to interference by this court if its action was arbitrary, oppressive, or unreasonable and represented its will and not its judgment. In other words, sitting in review, our jurisdiction as to fact questions is limited to the determination of whether there is reasonable evidence to sustain the findings. The board must on a hearing de novo apply and use its independent judgment in evaluating all the testimony determinative of the issues before it. Whether it kept within its jurisdiction and proceeded on a correct theory of

law has not been challenged. The determinative issues were fact issues. Whether the evidence was such that the board might reasonably make the order or determination which it did, finds affirmative support in the record. The determination of the probative force to be given to the expert testimony submitted, which in this proceeding constitutes a large part of the record, is for the trier of fact. Appellate courts are inclined to defer to the judgment of the trier of fact as to the weight to be attached to the testimony of expert witnesses. 7 Dunnell, Dig. (3 ed.) § 3334; Carlson v. Chicago G. W. R. Co. 114 Minn. 382, 131 N. W. 375. In the final analysis it was for the board to exercise its own judgment, in view of the fullest disclosure of facts by expert and other testimony, accompanied by numerous exhibits placed before the board at the hearing on appeal, as to how the ultimate fact issues should be decided. As we view the record, we cannot under the circumstances say that the findings and the decision of the board do not have support in the evidence.

We therefore conclude that the evidence reasonably sustains the findings and decision of the board.

Affirmed.