# STATE EX REL. BENNETT MINING COMPANY AND OTHERS v. J. G. ARMSON AND OTHERS.[1]

## February 26, 1926.

## No. 24,971.

**Allowable and nonallowable deductions in fixing occupation tax of mining companies.**

1. In ascertaining the value of iron ore for the purpose of determining the occupation tax imposed by L. 1921, c. 223, the tax commission allowed some of relators' claims to so-called nonstatutory deductions from the market price of the ore, and disallowed others. *Held* that discounts for payment before delivery were not allowable; that the evidence did not require the allowance of the full amount of claims for the expense of superintending shipments of ore from the mines to Lake Erie ports; that the cost of cargo analysis of ore in transit should have been allowed; that a deduction from the market price of standard ore, in the case of ores with a high percentage of alumina, should have been allowed; and that the evidence did not require an allowance of the full amount claimed as a return on money invested in a washing plant or the full amount claimed to cover depreciation thereof.

[1]Reported in 207 N. W. 732.

**Another allowable deduction.**

   2. So much of the expense of maintaining offices away from the mines as was connected with the operation of separating ore from its bed and bringing it to the surface was an allowable deduction under chapter 223, § 2.

**Proof defective as to allowance for royalties paid in advance.**

   3. The evidence failed to establish with sufficient definiteness and certainty the claim of one of the relators to a deduction for royalties paid in advance.

   Licenses, 37 C. J. p. 250 n. 69.


Certiorari to review the action of the Minnesota Tax Commission determining the amount of the 1924 occupation tax of relator companies. Remanded.

*Washburn, Bailey & Mitchell* and *John B. Putnam,* for relators.

*Clifford L. Hilton,* Attorney General, *G. A. Youngquist,* Assistant Attorney General, and *Patrick J. Ryan,* for respondents.

*William S. Elliott* and *Edward R. Lewis,* filed a brief as amici curiae.


LEES, C.

The relators are eight mining companies, dissatisfied with the tax commission's determination of the occupation tax they must pay for the year 1924. They are here on a writ of certiorari to obtain a review of the action of the commission.

In State ex rel. Inter-State Iron Co. v. Armson, supra, page ——, we considered many of the points raised here. Insofar as questions common to both cases are presented, they are disposed of in the opinion in the Inter-State Iron Co. case.

It is urged that, in ascertaining the value of relators' ore at the mouth of the mines, a discount from the Lake Erie published market prices should have been allowed. This is the basis for the claim: Annual contracts for the sale of ore generally provide that one-twelfth of the ore shall be delivered monthly, payment to be made in monthly instalments, but, if payment is made before delivery

the purchaser shall have a discount. No deliveries are made after the close of navigation on the Great Lakes, but the purchaser may and often does pay for ore which cannot be delivered until after the opening of the following season of navigation.

The relators' mines are operated and the ore marketed by Pickands, Mather & Co. of Cleveland, Ohio. A copy of their form of contract with purchasers of ore was introduced in evidence. It provides that the purchaser shall have a discount if he pays in advance of delivery. It was shown that it is customary to insert such a provision in annual contracts, but not in those which run for more than a year. Some of the ore was sold under long term contracts, but the quantity was not shown, neither was it shown that purchasers actually received a discount. We think the proof was too indefinite to require the commission to allow the claim.

But, this aside, in no event do these discounts affect either the value or the market price of the ore. They represent interest on money paid before it is due, or rather an allowance on the purchase price for the advantage the seller gains by receiving his money in advance.

The relators claimed a deduction of ten cents a ton as a charge for attending to the shipment of ore from the upper lake docks to the lower lake ports. The commission allowed five cents a ton. Relators complain because the amount claimed was not allowed. The contract between Pickands, Mather & Co. and the Balkan Mining Co. one of the relators, is in the record. It appears therefrom that, on ore they sold to themselves or to the Youngstown Sheet & Tube Co., Pickands, Mather & Co. were to receive a certain commission, and on ore sold to others a greater commission. The record does not show how much ore they sold in 1924 to themselves or to the Youngstown Sheet & Tube Co. The one witness who testified on the subject said that only a small tonnage was sold in the open market. Furthermore, the contract shows that Pickands, Mather & Co. were to operate the Balkan Company's mine in addition to taking charge of the shipment and sale of the ore mined. The sum they were to be paid for all the services they rendered was deter-

mined by the tonnage produced. There was no separation of their compensation and it was not shown what portion was to be paid for their services in selling the ore. There was no showing that the contracts with the other relators are different, and we think relators have no ground for complaint because their claims were not allowed in full.

The evidence shows that all ore is sampled and analyzed after it is loaded on vessels at the docks and before it is delivered to the purchasers, and that the expense of cargo analysis is divided between the buyer and seller. The relators claimed a deduction for this item of expense, but the commission refused to allow it. Clearly this is a necessary expenditure incurred between the mines and Lake Erie ports. It stands on no different footing than charges for freight, shrinkage and cargo insurance. The commission was in error in refusing to allow this claim.

The ore taken from a mine owned by one of the relators was below standard because it contained a high percentage of alumina. Lake Erie prices are those quoted for standard ore. A deduction of fifty cents a ton was claimed as to this ore. The commission disallowed the claim. Although the testimony in support thereof was not entirely clear and satisfactory, enough was shown to require a deduction in some amount for the inferior quality of this particular ore. It was error to deny the claim in toto.

The Balkan Mining Co. claimed an allowance of $70,585.37 for depreciation and as a return on its investment in a washing plant. The commission allowed $63,289.10; complaint is made on this score. The testimony in support of the claim was given by an account employed by Pickands, Mather & Co., who said:

"We have felt, in order to fairly reflect the profit or return which should be apportioned to this manufacturing process, that at least ten per cent on the net undepreciated washing plant should be allowed as such profit."

Other witnesses testified that some mining companies made a charge of six or seven per cent. The commission allowed a deduc-

tion based on the lower percentage and its action cannot be disturbed.

Under subdivision 1, § 2, the commission allowed office expenses at the mines, but not those incurred at offices maintained in Duluth and Cleveland by Pickands, Mather & Co., who charged a portion of the expense of their maintenance to each of the several mines they operated. The language of chapter 223, § 2, is not broad enough to include expenses which have no direct relation to separating the ore from its bed and elevating it to the surface. By this we do not mean to say that nothing but wages paid to those actually engaged in doing this work is an allowable deduction. The services of mining engineers and superintendents are just as necessary as those of day laborers. Neither do we mean to say that no expense can be deducted unless it was for services rendered in or about the mine. The statute is not to be construed so narrowly. Accounts must be kept, payrolls made up, and supplies purchased, or the work of extracting the ore from the earth cannot go on. Within reasonable limits expenses incurred for these and other like purposes are directly attributable to the working of a mine and should be allowed. Under the evidence it is fairly clear that at least a portion of the office expense was of this nature and that some allowance on this account should be made.

In 1917 the Bennett Mining Co. entered into a contract with the Keewatin Mining Co., denominated an "iron ore purchase contract." The Keewatin Company was the fee owner of the land upon which the Bennett mine is located. It also owned buildings, machinery, hoisting apparatus, railway tracks and cars, a pumping plant, and tools and appliances which it used in operating the mine. According to the terms of the contract the Bennett Company purchased all the personal property above mentioned as well as the ore underground. The contract provided that the ore was to be removed within 50 years. The total purchase price was $1,700,000, of which $407,319.46 was paid in cash when the contract was executed. The remainder was made payable to the Van Buren Iron Mining Co., payment to be made at the rate of fifty cents a ton for each gross ton

mined and shipped, the whole to be paid prior to the year 1927. The Bennett Company further agreed to pay the Keewatin Company 85 cents a ton for a portion of the ore mined and 65 cents a ton for the remainder, with a minimum annual payment of $522,500.

In its report for 1924, the Bennett Company claimed a deduction on the theory that the sum paid to the Keewatin Company when the contract was executed was in the nature of an advance royalty. The commission made a summary statement of the factors which entered into the determination of the tax to be paid, saying:

"The Keewatin Mining Company, to whom these royalties are paid, have raised a question as to the legal nature of these payments, with reference to the Royalty Tax Law. This Company is also one of the litigant parties in the pending Royalty Tax Suits. For these reasons it has been considered advisable to withhold allowance of the above amount, pending a determination of these suits as well as a determination of the legal status of these payments."

The Royalty Tax Law mentioned is L. 1923, p. 258, c. 226, which imposed a tax on royalties received by owners of mineral lands for permission to explore, mine, take out and remove ore therefrom. The validity and effect of this act have been litigated in the United States District Court for this district and an appeal from the decision is now pending in the Supreme Court of the United States. In view of these facts we ought not to pass upon the question, for it has not yet been finally determined by the commission. Moreover, the advance payment covered not only the ore but the buildings and mining equipment as well. No attempt has been made to separate the amount paid for the last mentioned property from the amount paid for the ore, or for the privilege of mining and removing it. There was nothing upon which the commission could determine what portion of the money was paid as a royalty and what portion for the mining equipment. Manifestly the showing was not such as to compel the allowance of the claim.

This disposes of all questions not presented in State ex rel. Inter-State Iron Co. v. Armson, supra, page 230. The commission must

determine the tax of these relators anew, and the proceedings are remanded for that purpose.