# IN RE PROCEEDINGS TO ENFORCE PAYMENT OF DELINQUENT REAL ESTATE TAXES, ST. LOUIS COUNTY.
# STATE v. OLIVER IRON MINING COMPANY AND OTHERS.[1]

December 11, 1936.

No. 30,723.

[1]Reported in 270 N. W. 609.

*Harry H. Peterson,* Attorney General, *Frederic A. Pike,* Assistant Attorney General, and *Thomas J. Naylor,* County Attorney, for the State.

*Charles E. Adams, Charles T. Wangensteen,* and *Patrick J. Ryan,* Special Attorneys for County of St. Louis.

*Elmer F. Blu, Clarence J. Hartley, Kellogg, Morgan, Chase, Carter & Headley,* and *Thomas F. Patton,* for Oliver Iron Mining Company, Allegheny Iron Mining Company, Seneca Iron Company, Elba Iron Company, Luzerne Iron Mining Company, Northern Development Company, Owasco Iron Company, Minnesota Iron Company, Sharon Ore Company, Rouchleau-Ray Mining Company, Lake Superior Consolidated Iron Mines, Tubal Iron Mining Company, Rathbun Iron Mining Company, Republic Steel Corporation, and Hanna Ore Mining Company.

*Mitchell, Gillette, Nye & Harries* and *William K. Montague,* for St. James Mining Company, Snyder Mining Company, and Corrigan, McKinney Steel Company.

Julius J. Olson, Justice.

We have for review orders of the trial court refusing new trials after findings and orders for judgment had been entered in proceedings brought by the state to enforce the unpaid taxes levied upon 43 iron ore mines on the Mesaba Range, St. Louis county, the issue being whether the trial court reached proper results in respect to the values of these mines for taxation purposes as of May 1, 1932.

Defendant Oliver Iron Mining Company and 14 other subsidiaries of the United States Steel Corporation declined to pay the last half of the 1932 taxes upon 36 iron ore mines in St. Louis county. Five companies owning seven different mines and occupying similar situations are the other defendants.

The tax commission, pursuant to statutory authority, fixed the valuations for assessment purposes upon these mines as of May 1, 1932. As permitted by and in conformity with the statute, the owners, for the purpose of raising the issue respecting valuations, refused to pay the second half of the taxes so levied, and the state proceeded to enforce judgment for the remaining portion. Proper pleadings were framed and issues joined. At the opening of the trial the state offered in evidence the delinquent list of real estate taxes for the year 1932, particular reference being had to the properties here involved. Having thus made a *prima facie* case, it rested.

The sole issue was the value of these several mines as of May 1, 1932. The cases were heard before five of the judges of the eleventh judicial district. There was a lengthy and most thorough trial. Four of the judges joined in the findings made and therein fixed and determined the valuation to be placed upon each of these properties. As to seven mines the court found that the valuations placed thereon by the tax commission were proper and ordered judgment for the payment of the unpaid portion of the taxes and for interest, penalties, and costs. Respecting the remaining properties, the court determined the true value as to each thereof and ordered judgment for that part of the tax which the decreased valuations justified.

The state, excepting only the properties as to which it had prevailed, moved for amended findings or, if such were denied, for new

trials. Except for certain relatively unimportant matters, the court denied the state's motions. The mining companies sought similar relief as to the properties against which the court had sustained the valuations of the commission. Their motions having been denied, they too appeal. So the contending forces are both appellants and respondents here.

There is and can be no question that the basis for taxation of mining property has for its foundation statutory authority and direction. 1 Mason Minn. St. 1927, §§ 1992 and 1992-1, provides:

"1992. All property shall be assessed at its true and full value in money. In determining such value, the assessor shall not adopt a lower or different standard of value because the same is to serve as a basis of taxation, nor shall he adopt as a criterion of value the price for which the said property would sell at auction or at a forced sale, * * * but he shall value each article or description of property by itself, and at such sum or price as he believes the same to be fairly worth in money. * * * In valuing real property upon which there is a mine or quarry, the same shall be valued at such price as such property, including the mine or quarry, would sell for at a fair, voluntary sale, for cash.

"1992-1. It shall be the duty of every assessor and board, in determining the value of lands for the purpose of taxation and in fixing the assessed value thereof, to consider and give due weight to every element and factor affecting the market value thereof, * * *."

In an exhaustive memorandum prepared and concurred in by four of the district judges, the theory and bases for the conclusions reached are fully and adequately stated. A dissenting memorandum was filed by the dissenting judge. A reading of the two memoranda clearly points out the issues presented here for determination. We shall take up first the theory upon which the majority proceeded. The court found that there was no cash market for sales of iron ore properties upon the Mesaba Range "from a willing seller to a willing buyer, upon which a Tax Commission or a court can base a valuation of such properties. All parties to these proceedings admit it."

The formula adopted by the majority is known as the Hoskold formula. This is now accepted, so the trial court found, "by both the State and the defendants as the best available basis for valuing ore deposits. It is used by other State Tax Commissions in making valuations of ore deposits, and is used by mining men in buying and selling ore properties. It is approved by the courts. Newport Min. Co. v. City of Ironwood, 185 Mich. 668; State Tax Comm. v. Magna Copper Co. 41 Ariz. 97, 15 P. (2d) 961. But its use is that of a guide, its results to be modified according to the judgment of parties interested as to the accuracy of the factors used in applying it. The purpose of the formula is (1) to ascertain the difference between the selling price of the ore and the cost of producing it, and (2) to ascertain the factor to be used in order to arrive at the present worth of the estimated future profits of the ore produced from the property to be valued."

The court remarked that it had been working under "great difficulties"; that the "prosperity" years were abnormal on that side and that the "depression" years had been just as abnormal in the other direction. Hence, so the court thought, "in the use of the formula, we have had to compose differences, sometimes quite reluctantly, because no one of us could be certain how much of the past in the iron mining industry could be depended on to reflect the long future with which we had to deal."

In fixing the value of iron ore it has been the custom over a period of more than 20 years to take the "Lake Erie price" as a basis. In fixing values in the instant case the court took into account the actual Lake Erie price for the years 1929 to 1934. The court thought that in fixing the price as of May 1, 1932, it had a "right to consider subsequent years as a test of our conclusion that the base price that prevailed from 1929 to 1932 will continue into the future." During these years, so the court found, no Mesaba Range ore "has been sold above the Lake Erie price; and some ore has been sold below" the same. The thought of the court was that this theory gave to the state "the highest possible profit spread under the Hoskold formula and therefore the maximum valuation insofar as the selling price determines it." Respecting the propriety of this

formula, the court said that at least since 1929 it has been a "pegged" price. "We do not say that in criticism of it; for it is a top, not a bottom, price. If it is pegged high, it has its social as well as its economic implications. Unless there is a profit spread between the producing cost and the selling price, the industry cannot operate."

The application of the Lake Erie price seems to be the rock upon which the court split. The dissenting judge was of opinion that it was "a fixed, fictitious and artificial price which the ore companies themselves have made," and for their own advantage. He was of the view that the mining companies "are undoubtedly in a position to prove the value of their ore bodies by substantial evidence of real probative force, they having all of the information necessary to make such proof. The state, of course, was without such information and unable to furnish proof of that kind. Defendants being in a position to furnish substantial evidence as to the value of their ore bodies, ought not to be permitted to base such values on the Lake Erie price which, as I view it, is a device of their own creation to fix values as they desire."

Speaking of the majority memorandum, the dissenting judge said: "It is also stated in said memorandum that such price was pegged high. As I view the matter, there is no evidence of any probative value before us from which it may be said whether it is high or low." For this reason the dissenting judge thought that the presumption of law going with valuations placed upon property assessed by the taxing authorities had not been met and overcome by the mining companies and as a consequence the valuations placed by the tax commission should be sustained and judgment ordered for the state for the full amount of the levy.

In summary fashion, these, then, are the principal issues for determination. There are others, to be sure, argued at length by counsel, but as far as necessary to decision we shall discuss these later.

There are certain elements common to all cases which may be considered and disposed of together.

■ At the bottom of the state's theory of the case is the claim, quoting from counsel's brief, that "no valuation for assessment purposes may be overthrown unless the taxpayer, upon whom the burden rests, shows 'clearly' and 'manifestly' that his property has been overassessed." With this hypothesis assumed, counsel for the state proceed with the assertion that the Lake Erie price and the Hoskold formula are inadequate to form the bases for defendants' expert testimony; hence that the trial court in making its findings and conclusions was not possessed of competent evidence adequate to sustain defendants' valuations. This also seems to have been the view of the dissenting judge.

Important here and to be kept constantly in mind is the fact that the jurisdiction of this court is appellate. We cannot take the place of the trial court, which after all is, under the statute, the trier of the facts. Sitting in review, our jurisdiction upon fact issues is necessarily limited to one question: Are the findings of the triers of fact sustained by the evidence? That is the general rule. Our cases uniformly so hold. See Exrieder v. O'Keefe, 143 Minn. 278, 279, 173 N. W. 434; C. Gotzian & Co. v. Truszinski, 169 Minn. 199, 202, 210 N. W. 880; In re Establishment of Judicial Road, 176 Minn. 94 (syllabus paragraph 2), 222 N. W. 578; Alexander v. Wells-Dickey Co. 177 Minn. 101, 102, 224 N. W. 849; Sommers v. City of St. Paul, 183 Minn. 545, 552, 237 N. W. 427. The next question naturally follows: Are tax valuation cases to be classified under a different rule, and, if so, what is the rule to be applied? Referring to our cases we find that Chief Justice Brown in State v. South St. Paul Syndicate, 140 Minn. 359, 360, 168 N. W. 95, a tax case, speaking for a unanimous court, said:

*"The rule guiding this court in the review of the findings of the trial court in proceedings of this kind is the same as that applied in ordinary civil actions; and to justify interference with such findings it must appear that they are clearly and manifestly against the evidence.* In the light of the rule we have read the record with care and find no reason for disturbing the findings here under review. The evidence is conflicting as to the actual value of the property; the trial court was familiar with the situation and loca-

tion of the land, and in position to give proper weight to the opinions of the various witnesses. A discussion of the evidence would serve no useful purpose. It is not clearly or manifestly against the findings and there must therefore be an affirmance." (Italics supplied.)

And later, in State v. Koochiching Realty Co. 146 Minn. 87, 89, 90, 177 N. W. 940, the same jurist said, and we deem his language so pertinent to present issues as to require a somewhat extended quotation:

"The defense of unfair and unequal real-estate assessments, in resistance of the tax judgment provided for by our taxation procedure, has been available to the property owner in this state for many years, in fact, since the revision of the tax code in 1874. Chapter 11, section 79, G. S. 1878. The statute giving the defense was first construed in County of Otter Tail v. Batchelder, 47 Minn. 512, 50 N. W. 536, where it was held that to authorize a reduction of the tax complained of in any particular case, it must be made to appear that the assessment was fraudulently made, or so grossly excessive as to justify the conclusion of a 'demonstrable mistake of fact,' following the rule applied in local assessment proceedings by municipal corporations. State v. Board of Public Works, 27 Minn. 442, 8 N. W. 161, and State v. District Court of Ramsey County, 29 Minn. 62, 11 N. W. 133. But the defense so given was subsequently rendered of no practical value to the property owner, if it was not in effect wholly taken away, in State v. Lakeside Land Co. 71 Minn. 283, 73 N. W. 970, and State v. West Duluth Land Co. 75 Minn. 456, 78 N. W. 115. The decision in the last of which was handed down in February, 1899, and brought from the legislature at the 1902 special session, an amendment of the statute by the insertion therein of a clause to the effect that in cases where real property 'has been  *  *  *  taxed at a valuation greater than its real and actual value,' the court on the defense being made and sustained by the evidence 'may reduce the amount [of the tax]  *  *  * and give judgment accordingly.' The amendment is embodied in the revised section of the statute as it appears in G. S. 1913, § 2108.

The former statute authorized a reduction only where it was made to appear that the assessment was unfair and unequal. *The amendment was a distinct change and evidently intended to overcome the decisions referred to above. It explicitly authorizes a reduction in all instances of overvaluation, and must be deemed as abrogating anything to the contrary found in the decisions construing the former statute.*" (Italics supplied.)

Among our later cases the following are of value: State v. Savage, 155 Minn. 501, 193 N. W. 114; In re Potlach Timber Co. 160 Minn. 209, 199 N. W. 968; In re Enforcement of Taxes Delinquent for Kanabec County, 164 Minn. 522, 204 N. W. 640; In re Delinquent Real Estate Taxes, Ramsey County, 165 Minn. 489, 206 N. W. 657; State v. Trask, 167 Minn. 304, 306, 307, 209 N. W. 18, 19. From the case last cited the following quotation seems appropriate:

"From the evidence before us, if we were finding the facts, some of us would find the values much less; but if we did we would differ greatly in our estimates. *The fixing of values, in review of the taxing authorities, is not committed to us but to the district court;* and with the burden on the objecting landowner and with due regard to the returns of the taxing officers ·it was justified in making the findings assailed." (Italics supplied.)

The same result was reached in the recent case of State v. Walso, 196 Minn. 525, 265 N. W. 345.

There can be no denial that after all the position contended for by the state is based upon a rule of *prima facie* only. As such, it must give way to facts when these are adequate to overcome the state's *prima facie* case. If this were not so the effect of 1 Mason Minn. St. 1927, § 2120, which gives the taxpayer the right to defend against an assessment upon the ground that his property "has been assessed and taxed at a valuation greater than its real and actual value," and giving to the court the power to reduce the amount of taxes, would be lost, in fact, made meaningless.

This court in State ex rel. Inter-State Iron Co. v. Armson, 166 Minn. 230, 232, 207 N. W. 727, 728, said:

"The primary responsibility for a correct determination of the tax rests upon the commission. In placing a valuation upon the ore, the commission occupies a position much the same as that of an assessor, who exercises a quasi-judicial function in determining the value of property subject to taxation, Stewart v. Case, 53 Minn. 62, 54 N. W. 938, 39 Am. St. 575, and whose determination is presumed to be the expression of his honest judgment. State v. London & N. A. M. Co. 80 Minn. 277 (286), 83 N. W. 339. It is well settled that in reviewing an order or determination of an administrative board, this court will go no further than to determine: (1) Whether the board kept within its jurisdiction; (2) whether it proceeded on a correct theory of the law; (3) whether its action was arbitrary, oppressive or unreasonable and represented its will and not its judgment; and (4) whether the evidence was such that it might reasonably make the order or determination in question. State ex rel. Dybdal v. State Securities Comm. 145 Minn. 221, 176 N. W. 759, and cases collected in Dunnell, Dig. 1921 Supp. § 397b."

And in County of Rock v. McDowell, 157 Minn. 296, 196 N. W. 178, and State v. Meck, 161 Minn. 334, 201 N. W. 536, this court held that introduction of the delinquent tax list makes a *prima facie* case for the state in cases where the property owner answers and seeks to avoid the imposition of the tax or to have his tax burden lessened by showing overvaluation of his property. But, in the language of the court, the case so made is *prima facie* only, and as such must give way when adequate, competent, and credible evidence opposed thereto comes into the case.

That the court was fully cognizant of the rules applicable to its problems adequately appears in its memorandum wherein, amongst other things, it said:

"The Tax Commission has, since its inception, used a classification of iron ore properties, which has been modified from time to time, as a basis for valuations for tax purposes which was apparently not satisfactory either to the Tax Commission or to the defendants. In this proceeding the State does not undertake to defend or justify the valuations thus made. It does not now ask us

to accept such valuations as either accurate or proper. It does ask us to apply rules as to burden of proof so that no change be made in such valuations; but it does not assert that such valuations represent either relatively or absolutely the true values of such properties. Indeed, the State's valuations at this trial differ more widely from the Tax Commission valuations than the defendants' do."

And the court pointedly calls attention to the fact that the formula used by defendants was approved by the tax commission's engineering expert; that no member of the commission testified in support of the valuations placed by them upon these properties or the method employed in making such valuations; that "under such a state of the record, the claim that the defendants have not sustained the burden of proof, howsoever heavy such burden may be in Minnesota, cannot be sustained. While the court acts merely as a reviewing body in such cases as these, the practical situation here requires us to make an original valuation. The testimony of the State's witnesses, the arguments of counsel for the State, and the entire conduct of the trial invite us to make an original valuation of the properties as a basis for our review of the valuations made by the Tax Commission."

■ As has been said, the basis for the assessment of property is fixed and defined by statute. 1 Mason Minn. St. 1927, §§ 1992 and 1992-1, heretofore quoted. So the question to be answered is: What was the sale or market value of each of these mines at the time of assessment? If there are insufficient sales to establish a market value based thereon, "there is no way of determining values except by the judgment and opinion of men acquainted with the lands, their adaptability for use, and the circumstances of the surrounding community." State v. Fritch, 175 Minn. 478, 480, 221 N. W. 725, 726; State v. Russell-Miller Mill. Co. 182 Minn. 543, 544, 235 N. W. 22; State ex rel. City of South St. Paul v. McNiven, 183 Minn. 539, 540, 237 N. W. 410.

In the cases for review there is no disagreement as to the fact that sales of mining properties are not sufficient in the locality of these mines to establish a market price or value. It is likewise

without dispute that the usual and accepted method of valuing mining properties is based upon a computation of the present worth of estimated future profits. In the tax commission's 1932 report that is made the basis for determination of values. It there said: "Future profits are used as a basis of value. As practically all of the iron ore mined in Minnesota is sold at Lower Lake Ports, the price of the ore at these points is used. It is necessary, therefore, to determine the cost of delivering the ore to the Lower Lake Ports. The various factors used to obtain the value per ton may be summarized as follows:" (Then follows a list of the various items to be considered in arriving at the net and true value of the property; in fact, the state used as exhibits at the trial the valuation sheets employed by the commission. A copy of one of these, all being alike as to form, is found in the margin.[2])

[2]"Plaintiff's Exhibit U-1 [Record, Vol. 5, pp. 112-113]
No. 1. (O. I. M. Co. #20)
Property: Nelson
Company: Northern Development Co., Fee

### VALUATION AS OF MAY 1, 1932

| ITEM | OPEN PIT | UNDERG'D | TOTAL |
|---|---|---|---|
| A. TAX DISTRICT: Eveleth City | | | |
| B. DESCRIPTION: Lot 1, Sec. 31-58-17 | | | |
| C. RESERVE TONNAGE OF UNMINED ORE | 5,102,100 | 1,025,000 | 6,127,100 |
| D. LAKE ERIE SELLING VALUE PER TON | $4.708 | $4.708 | $4.708 |
| E. ESTIMATED COSTS PER TON: | | | |
|   1. Mining | $ .318 | $1.394 | |
|   2. Miscellaneous | .097 | .210 | |
|   3. Transportation (Rail & Lake)... | 1.741 | 1.741 | |
|   4. Development | .116 | .058 | |
|   5. Plant | .046 | .068 | |
|   6. Ad valorem tax on unmined ore.. | .608 | .310 | |
| F. TOTAL OF ITEM E | 2.926 | 3.781 | |
| G. ESTIMATED FUTURE INCOME (Item D minus Item F) | 1.782 | .927 | |
| H. LESS RETURN OF 6% ON FUTURE INVESTMENT IN DEVELOPMENT, PLANT AND WORKING CAPITAL | .051 | .137 | |
| I. ITEM G MINUS ITEM H | 1.731 | .790 | |

It will be noted that in the exhibit "Lake Erie Price" is made the basis for the sale value of the ore. This method appears to have been in use by the commission over a period of many years. The chief objection raised to it, on the part of the state and the dissenting judge, is that the mining companies are supposed to have determined the value, or, put in different form, that they fixed Lake Erie prices. We have examined the record and find no difficulty in sustaining the trial court that the Lake Erie price is in fact high and that ore sold by so-called independent mining companies at times sells for less than this price and never higher; that it is accepted by competing steel industries as a measure of iron ore value; that taxing authorities in this and other states use it as the measure of fixing the value of iron ore for taxation purposes. Any purchaser, whether of iron ore or an iron mine on the Mesaba Range, would necessarily have to base his computation of value upon, and only upon, the "Lake Erie Price." That is so because that price is and has been the only recognized standard of value. Under these circumstances, we can see no reason for disturbing the

| | | | |
|---|---|---|---|
| J. PRESENT WORTH OF ITEM I FOR 33-YEAR LIFE, AT 6% (Factor .431219) | .746 | .341 | |
| K. LESS INACTIVE TAXES AND RETURN AT 6% FOR A 0 YEAR PERIOD ON OPEN PIT AND A 3 YEAR PERIOD ON UNDERGROUND | ... | .050 | |
| L. BALANCE PRESENT WORTH BEFORE DEFERMENT | .746 | .291 | |
| M. PRESENT WORTH PER TON OF ITEM L, DEFERRED 0 YEARS ON THE OPEN PIT AND 3 YEARS ON THE UNDERGROUND, AT 6% INTEREST: | | | |
| Deferred Period Factor | | | |
| Open Pit....No....Years ....... Underground 3 Years .839619 | | | |
| PRESENT WORTH PER TON | .746 | .244 | |
| TOTAL VALUATION OF PROPERTY | $3,806,167 | $250,100 | $4,056,267 |
| MINNESOTA TAX COMMISSION VALUATION | | | $3,798,802 |

findings of the trial court. It recognized and applied this price as a means of arriving at taxable value because it was in fact the only recognized standard.

No. 1 (O. I. M. Co. #20)
Property: Nelson

DATA
MAY 1, 1932, VALUATION

| ITEM | OPEN PIT | UNDERG'D | TOTAL |
|---|---|---|---|
| C. RESERVE TONNAGE OF UN-MINED ORE .................. | 5,102,100 | 1,025,000 | 6,127,100 |

AVERAGE ANALYSES:

|  |  | Dried | 212 deg. F. | | | 1922-31 Nat. L. Erie |
|---|---|---|---|---|---|---|
|  | Tons | Iron | Phos. | Sil. | Moist | Iron Value |
| B. | 3,490,500 | 60.68 | .040 | 6.35 | 11.20 | 53.88 $5.029 |
| NB. | 2,217,000 | 58.23 | .068 | 6.33 | 14.40 | 49.84) |
| PR. | 419,600 | 53.07 | .096 | 8.41 | 18.00 | 43.52) |
| NB. | | | | | | ) |
| PR. | 2,636,600 | 57.39 | .072 | 6.66 | 14.97 | 48.80)$4.282 |

D. Lake Erie SELLING VALUE PER TON (Average 1922-1931) ......     $4.708

E. ESTIMATED COSTS PER TON:

   1. MINING:

| Type | Tons | Cost Per Ton | Cost | Total Tonnage Of Ore |
|---|---|---|---|---|
| R.R. (Ore | 3,334,200 | .246 | $820,213 | ........ |
| (L. O. | 119,200 | .296 | 35,283 | ........ |
| ( | | | | |
| M&S )Ore | 1,767,900 | .421 | 744,286 | ........ |
| )L. O. | 49,800 | .471 | 23,456 | ........ |
| ) | | | | |
| Total O. P. | | | $1,623,238 | 5,102,100    $ .318 |

   4. DEVELOPMENT:

| | Cu. Yds. | Cost Per Yard | Total Cost |
|---|---|---|---|
| O.P. Surface & L. O. | | .30 | $ 6,840 |
| Rock | 780,000 | .75 | 585,000 |
| Total Cost | ... | | $591,840 |
| Total Tons | ... | | 5,102,100    $ .116 |

Much is said by counsel for both sides in their briefs with regard to the so-called "commercial appraisal method." Counsel for the state in their brief say, amongst other things:

"Essentially, the commercial appraisal method seeks to determine the quantity and quality of ore in the ground, the price at which it will sell when mined, the cost of mining, and the life of the mine, in order to fix the period of time when the resulting profit will be realized. The values are then arrived at by reducing these profits to their present worth. Involved in the latter calculation is a determination of the rate of return which will induce a willing buyer to purchase a given property and which a willing seller will forego in order to make a sale."

The so-called Hoskold formula has been in use over a very long period of time. There is substantial evidence that its use extends back over a period of nearly 100 years by valuation engineers in connection with making sales of mining property and with regard to the conduct of mining operations; also by taxing authorities where such properties are involved. Briefly, the method according to that formula is one of estimating the future profits to be made from the venture, the time at which those profits will be received, and then computing present value under a plan which provides for the return of capital to the investor. It is based upon the assumption that as the ore is mined the income of each year must be considered partly as a return of capital and partly as a profit on the venture. Again, referring to brief of counsel for the state, it is said with regard to the Hoskold formula:

"There was no dispute upon the part of the State about the fact that computations of *value made in accordance with the above described commercial appraisal method would present a competent and probably the only available guide as to the present worth of mines in Minnesota* if the factors used in the calculation were true and correct." (Italics supplied.)

Counsel, however, dispute "the propriety of calculating the sinking fund at a low safe return rate."

From the conduct of the trial as shown by the record before us, we entertain no doubt that all parties recognized the Lake Erie price and the Hoskold formula as appropriate means for ascertaining the value of the assessed mines. The difference of opinion comes not from the Lake Erie selling price or the Hoskold formula but rather and fundamentally because of the various items of deduction from that price that should properly be made when applied according to the formula itself.

As is natural and perhaps proper, both sides to this controversy claim that the court erred regarding fact issues adverse to their respective contentions. Thus we find various subdivisions into which counsel in their briefs have divided their attacks. To discuss each separate item would involve a task that is not only arduous but, we think, wholly unnecessary because, after all, the issues of fact having been found and determined by the triers thereof, our only inquiry, as already has been stated, is whether the evidence reasonably sustains the conclusions reached.

Among the contentions made, we think a discussion of the following necessary:

(1) For the state it is claimed that the court should have considered a ten-year average, or perhaps a longer one than that, as to the selling price of iron ore at Lake Erie points. The court took a five-year average, the years 1929 to 1934. The mining companies were of opinion that the court adopted a wrong period of time in determining the ore value. Of course the important thing to determine was the value of the particular property as of May 1, 1932. No one claims that the selling price of ore on that particular day would necessarily determine the value of a mine although it undoubtedly would have some bearing. A mine has a future ahead of it. That future depends upon many contingencies. Mention of these is unnecessary because they will readily come to anyone's mind who is willing to give the matter some thought. As stated by counsel for the state:

"The selling price on May 1, 1932, if genuine, is informative to some extent. Selling prices for the preceding five years add to available knowledge. But the purpose of the inquiry is to forecast

the future, and the question is whether under all the circumstances either the 1932 price or the five-year average price, or some other price, will be the average or representative price to be realized as the ore is mined in coming years."

They inform us that in the year 1918 iron ore prices were fixed by the federal government. During that year the opening Lake Erie price was changed twice during the shipping season. At the beginning of the season non-Bessemer ore was quoted at $5.05 per ton. That price was increased to $5.50, and later to $5.75 during that season. In 1919 there was a falling off, and prices dropped back to $5.55. In 1920 there was an increase of demand, and prices rose to $6.55. In 1921 shipments were again reduced, and the published price was reduced to $5.55. The drop continued in 1922, and there was a reduction to $5.05. However, in 1923 the price was increased to $5.55 per ton. Thereafter from 1924 until 1929 the price range was from $4.25 to $4.75. Since then it has hovered around the lower figure, that is to say, about $4.50 per ton. Counsel for the state are of the view that the Minnesota occupation tax may have had something to do with the stability of the price of late years. Undoubtedly that factor was considered by the trial court and found not adequately sustained. At any rate, the findings of the court have substantial support in the evidence, and that eliminates further consideration by us.

(2) Capitalization and the rate of interest to be applied and used are subjects of much discussion by counsel for both parties. Dr. Leith testified that an eight per cent rate should be made the basis for fair compensation to the risk involved. In respect to capital rate invested upon a safety basis he thought a four per cent rate should be applied. The state's contention was that six and four per cent rates, respectively, would be more fair. The court found that the rates should be seven and four per cent. There is other testimony in the case ranging from ten per cent as to the capitalization risk and four per cent as the minimum respecting the safe annual income rate. The Michigan tax commission at first used the rates of five and four per cent and finally adopted the six per cent rate as to both items. Wisconsin has used various rates

ranging from six to ten per cent. Here, too, we think a fact question was presented and that neither the state nor the owners have just cause to complain.

(3) It is claimed in behalf of the state that "mining properties are essential and inseparable parts of. the great steel industry of the country. Their value as properties to be bought or sold must be considered in the light of the fact that they are so linked. It is true that people speculate in mining properties. There undoubtedly are iron ore deposits held by persons or companies not owners of or affiliated with furnaces or steel plants. But such ownerships are rare and exceptional."

The fact that most of these mines are owned by subsidiaries of the United States Steel Corporation is made much of by the state. It is conceded, however, "that we must, theoretically at least, arrive at valuations of these properties without reference to their ownership; we must speculate on what prospective purchasers would bid for existing properties in the hands of owners who would be free to sell or not to sell their mines as their judgment advised."

That is one of the difficulties with which taxing authorities have to deal. Each property is a separate unit. The fact that one may own several such units, under our taxation plan and system, does not change the necessity of charging each unit with the tax that it must bear as such unit. The law does not permit us, nor anyone else for that matter, to place a higher value upon a series of mines owned by a large corporation and a different rate or ratio with respect to mines individually owned. On this phase the court said:

"We are not permitted under the statute to consider consumer-ownership of ore bodies as a factor of valuation. Nor may we apply the unit-of-value rule. It is applicable in the assessment of railroad, telegraph, telephone, and express companies, where, from the very nature of the property, the value of any particular part can be determined only by a consideration of the whole. * * * In the exercise of the right to assess for purposes of taxation, we are limited by the market value of the property in this state. American Bauxite Co. v. Board, 119 Ark. 362, 177 S. W. 1151; Union R. T.

Co. v. Kentucky, 199 U. S. 194, 26 S. Ct. 36, 50 L. ed. 150, 4 Ann. Cas. 493."

(4) Considerable space is devoted to the so-called exhaustion period. In behalf of the state it was claimed that the average exhaustion period should be computed upon a basis of 36 years. The mining companies, on the other hand, sought to have the court find that such period should be at least 40 years. The court adopted a middle base, fixing that period at 38 years. Here, as elsewhere, there was ample room for difference of opinion. The court was not compelled to take either theory, and we think the evidence sustains the court in fixing the period stated.

(5) Another item concerning which complaint is made relates to interest on future investments in development, plant, and working capital. Counsel for the state say:

"We do not quarrel with the calculation relating to future investment in plant and development, transportation, or direct mining costs as to underground ores. As to underground ores, we question only the calculation of the interest return on taxes to be paid."

A great deal of discussion is devoted to the amount of working capital, the development of the mining plant as such, interest on future investments, deduction in the way of taxes that must be met, and the cost of selling commissions. All these and other items have received at the hands of respective counsel much attention and detailed argument. As to all of these there is considerable difference of opinion between what the contending forces are seeking to accomplish and the result reached by the trial court. We think the evidence sustains the court's findings. There are some, however, requiring separate discussion.

(6) As an item of deductible costs, the trial court permitted deduction of occupation and federal corporate income taxes. The state does not object to the occupation tax as being a proper item of deduction, but it seriously attacks any deduction for income taxes. Important to bear in mind, of course, is the fact that the income tax here involved is the corporate income tax, not that of the individual stockholder. We think the following cases sustain

the trial court: Galveston Elec. Co. v. City of Galveston, 258 U. S. 388, 42 S. Ct. 351, 356, 66 L. ed. 678; Georgia R. & P. Co. v. Railroad Comm. 262 U. S. 625, 633, 43 S. Ct. 680, 67 L. ed. 1144; Municipal Gas Co. v. Public Service Comm. 113 Misc. 748, 186 N. Y. S. 541, 549. The supreme court in the Galveston Elec. Co. case said (258 U. S. 399):

"In calculating whether the five-cent fare will yield a proper return, it is necessary to deduct from gross revenue the expenses and charges; and all taxes which would be payable if a fair return were earned are appropriate deductions. There is no difference in this respect between state and federal taxes or between income taxes and others. But the fact that it is the federal corporate income tax for which deduction is made, must be taken into consideration in determining what rate of return shall be deemed fair. For under § 216 the stockholder does not include in the income on which the normal federal tax is payable dividends received from the corporation. This tax exemption is therefore, in effect, part of the return on the investment."

The mining companies complain about the court's findings here in that only two-thirds of the tax was deducted. Their claim is that the entire tax should be so deducted. There is much force to the argument. However, we think the court was justified in its findings that:

"The federal corporate income tax (Line E-10) is held to be a cost item to such extent as the individual stockholder in the mining company is relieved of payment of his personal income tax by reason of the payment of the corporate income tax by the mining company. (Citing Galveston Elec. Co. v. City of Galveston, 258 U. S. 388, and other cases.) We have allowed two-thirds of the corporate income tax as a cost against the mining operation."

(7) A word should be said respecting selling commissions. The court allowed five cents per ton as to that item. The testimony in the case would justify a higher rate. The experts testifying for the defendants were unanimously of that opinion. The state, however, contends that as the United States Steel Corporation subsidiaries

are not selling ore, that they are both producers and consumers, hence there can be no selling or commissions for selling. They freely concede, however, that this is an item of cost properly applicable in computation of the occupation tax. If that be true it would seem equally appropriate to consider it as an item entering into the value of a piece of property on the part of one who wishes to make such investment. Obviously, to make a profit there must be a sale to someone, and to make such sale there must be service. A prospective buyer, an investor, purchasing a mine would very naturally, and we think with entire propriety, take into consideration all items of expense to which he must necessarily be put before realizing a profit, and profit is the very basis for determining values in these cases. See State ex rel. Bennett Min. Co. v. Armson, 166 Minn. 243, 207 N. W. 732.

(8) Another item that has brought about serious conflict between the contending forces is the moisture content of iron ore. The moisture to which reference is made is not free water which drains off, but moisture which remains in the ore when and as shipped. Of course, in computing the value of ore water must be squeezed out of it. From samples taken a chemical analysis is made. The ore sample is heated to 212 degrees Fahrenheit. This causes the moisture to evaporate and permits "dry iron analysis," thus making scientific accuracy possible. The moisture content as to mines here involved was obtained from drill-hole samples. As such, the amount of moisture is difficult to determine with accuracy; hence recourse was had to the opinions of men experienced in that line of endeavor. For the state it is claimed that these opinions should be discarded; that rather an estimate with respect to ore shipped from the same locality would furnish a better guide. These arguments were properly and exhaustively submitted to the triers of fact. They chose to adopt, to a limited extent only, the testimony of the experts for defendants. They had advantages of seeing and observing the witnesses, all men of merited and well-recognized standing and reputation.

This subject is one with which the court wrestled seriously. After the cause was heard additional testimony was requested and fur-

nished. As to 11 of the 36 properties involved the court accepted the moisture estimates presented by defendants, but as to the remaining 25 properties, as to both Bessemer and non-Bessemer ores, moisture was found to be less than that testified to by defendants' witnesses. The net result was to increase the computed present worth of the 25 mines over and above the amount which would have resulted had defendants' estimates been used throughout. It is said in behalf of the state that these estimates furnished by defendants "are but conjectures and are unreliable." An examination of the record does not justify this characterization. The value and weight of this and all other testimony was obviously for the triers of fact. Opinions founded upon expert knowledge cannot be classified as conjecture but rather as helpful guides in finding just results. Some experts are worthy of belief, and their testimony, because of their standing in the profession and the reasonableness and convincing qualities of their testimony, may be highly regarded; others may not be so qualified. With the trial court rested the duty of determining this fact issue. We cannot, nor should we, interfere.

There are many factors entering into this difficult question. Drill and shipping records of 95 per cent of the properties on the Mesaba Range were available for study, and so were the horizons from which shipments had been made. The result, as near as opinion can be said to justify such, reflects with reasonable accuracy the true facts. Testimony was furnished as to each mine. That the court gave this matter serious and efficient consideration the court's memorandum abundantly bespeaks.

(9) Entwined with what we have been discussing is also a deduction referred to as "revision of analysis." The dissenting judge said that he was "entirely satisfied * * * that the additional tonnages existing therein [the mines involved] will more than compensate the mining companies for any revision of analysis." The quoted statement is in the nature of an admission that defendants had established that iron ore as and when produced does not correspond in analysis with drill samples. The drill sample analysis is, for various reasons, not entirely reliable, but experience has taught those engaged in this industry that "there is not a very

wide range or difference of opinion between engineers familiar with that problem." It is a factor, and a proper one, entering into the computation of the present worth of a mine. No purchaser would shut his eyes to the probabilities in this respect any more than he would in respect of any other item going into the factors that intelligent judgment requires before an investment is made.

(10) Another item entering into the discussion relates to silica penalties. It appears that ore containing silica in excess of ten per cent is subject to a penalty, in other words, a lower price on the market than the ore containing ten per cent or less. In behalf of the state it is claimed that because these mining companies own many mines containing less than ten per cent silica and use the ore of this type to mix with ore of higher silica content that therein and thereby they in fact suffer no loss, hence that they should pay upon the basis of their entire holdings as and when mixed rather than upon the basis of each individually owned mine. The same argument could be used with equal effectiveness to a farmer who owns a bin of No. 4 wheat and one of No. 1. If by mixing these he improves the grade to an average of, we will say, No. 2 and as such realizes a higher price for the combined mixture than he would if he sold the contents of each bin separately, therefore he should be taxed upon the mixture rather than upon each individual bin. We know of no law relating to taxation permitting such classification, at least not until the mixed product is brought into being. And where, as here, the ore is still in the ground, we admit our inability to see any justification for such basis of assessment. So to hold is to make law, not to interpret it. It may readily be conceived that such assessment would run counter to constitutional objection. As heretofore said, each mine is a separate piece of property. We cannot place the owner of two mines, one of high silica content and another of low content, thereby making mixture possible, in a different position as to each such mine than another who happens to own but one.

(11) The witnesses are in agreement that there should be some initial period provided during which the operations of specific properties would be deferred. Counsel have divided this period into

two parts: (a) Physical deferment due to the time necessary for physically preparing the properties for shipment of ore; and (b) a depression deferment or postponement due to the financial conditions existing in and immediately preceding the taxable year, 1932. The court was of opinion that:

"We have allowed a deferment period of one year on the inactive developed properties and of three years on the reserves. The evidence is quite persuasive in support of the one-year period for the inactives, and both the State and the defendants use the three-year period for the reserves." With respect to the depression period the court said: "We have allowed no deferment period for the depression. We hold with the State that depression and boom periods are, or should be considered to be, inherent in the Hoskold formula." The court was of the view that opinions respecting the persistence of the depression were "too frail and diverse for a court now to use as a basis for determining the present worth of estimated future profits."

To determine future profits it was of course necessary for the court "to forecast the future." In doing so, however, it held that it was the duty of the court "to dare to test even expert opinion" by the trained experience and unbiased judgment of a court.

We have experienced no difficulty in coming to the same conclusion as that reached by the trial court. The position taken appears sound.

■ As to two mining properties, the court, using the same formula as had been employed in fixing the valuation of other mines, found the value of the ore in the Forster mine to be $2,312,362. The assessed valuation was $2,422,814. As to the Mountain Iron-Rathbun mine, the finding of iron ore value was $10,074,306. The assessed valuation was $10,145,322. In round numbers the differences in value are approximately $110,000 in the one and $71,000 in the other. Later, upon motion by the state and over the objection of the owner, the court changed its order and sustained the assessment as returned by the state. In its memorandum so sustaining the assessment the court said:

"Two members of the Court signing the attached order are of opinion that the order should be based upon the ground that the percentage of decrease in the full and true value of this mine, as found by the Court, is so small as not to make it 'manifest that there was an over-valuation' by the State. State v. Trask, 167 Minn. 304, 209 N. W. 18, and cases cited."

The dissenting judge was of the view that it was the duty of the court to make its own findings in respect to values; that when the valuation had been so found, whether greater or less than that of the assessing authorities, it became its duty to determine such fact, and that the conclusion of law had to follow the finding and was binding. Obviously, the majority thought it was governed by the rule that unless there be a "manifest" overvaluation by the state the assessment must stand. In State v. Koochiching Realty Co. 146 Minn. 87, 89, 90, 177 N. W. 940, the opinion clearly determines what the duty of the court is in this class of cases. The language of the statute is plain, i. e., relief is to be had when the property has been taxed "at a valuation greater than its real and actual value."

We think the dissenting judge was right. The overvaluation here is substantial and cannot be governed by the de minimis rule. The findings established that there was obviously "a valuation greater than its real and actual value." In consequence, a reduction "in all instances of overvaluation" should follow. Having used the same formula throughout, we can see no sound reason for a departure. To the extent of the overvaluation involved as to these two mines the order should be corrected.

There remains for consideration the mining properties owned by the so-called "independents." Their position is in substance and effect the same as that of the other mining companies with which we have been dealing. They contend, exactly as do the Oliver Iron Mining Company and its affiliates, that the trial court placed too high a valuation upon their mines and did not allow sufficient deduction for the various items we considered with respect to the other properties heretofore discussed.

Our particular attention is directed to the St. James and the Miller-Mohawk mines. These properties were acquired by the present owner in 1929 at the so-called peak of the high prices. The purchase price was $660,000 cash. At that time these mines were assessed by the tax commission upon a basis of full and true value of $1,075,000. Later, after the depression came, the owner sought to have the commission reduce the taxable value. Counsel say that in 1932, "at the height of the depression, the tax commission was still carrying the full and true value of these combined properties at $818,000 in spite of the fact that, as stated, they were sold for $660,000 in 1929."

Of course sale price is always an important element in determining value. But it is not the only method. A purchaser may make an unusually good bargain, and he may likewise make a bad one.

We have carefully examined the record respecting the evidence adduced and find that there is competent evidence to sustain the findings of the trial court. Clearly that ends the matter with us.

The other mines present fact issues only, and what we have hereinbefore said respecting the Oliver Iron Mining Company and its affiliates applies with equal force here.

In conclusion, it is fair to counsel to say that these cases have been presented in excellent fashion. The briefs have been very helpful. The voluminous record has been much simplified because of the briefs submitted and the oral arguments made.

Our conclusion is that the evidence sustains the findings made below; that the only two properties as to which there is error are the Forster and Mountain Iron-Rathbun mines. As to these the cause will be remanded for further proceedings in harmony with the views herein expressed. As to all other properties the orders of the trial court denying new trials stand affirmed.

DEVANEY, CHIEF JUSTICE (dissenting).

I cannot subscribe to the opinion of the majority of the court.

This decision presents no difficult legal question, but does possess far-reaching social and economic implications. It is clearly settled in the law that the burden is on the defendants to prove that the

valuations placed by the tax commission on their properties are clearly and manifestly excessive. State v. Koochiching Realty Co. 146 Minn. 87, 177 N. W. 940; In re Potlach Timber Co. 160 Minn. 209, 199 N. W. 968; State v. Trask, 167 Minn. 304, 209 N. W. 18.

The defendants sought relief through the courts from what they claimed to be excessive valuations placed on their properties by the tax commission, and secured it. The sole problem for this court is to determine whether or not there is credible evidence presented by the defendants to support the trial court's decision. In my opinion, clearly there is not.

The rock on which we split (and on which the lower court divided) is the Lake Erie base price. It is the foundation stone upon which defendants' entire case rests, and no other question is of more than incidental importance. It is therefore unnecessary for the purpose of a dissent to discuss or consider the many other questions presented on this appeal, among which are the Hoskold formula, penalties, discount and sinking fund rate, exhaustion period, moisture and silica content, and selling commission.

The Lake Erie base price is a device through which the defendants are in effect here permitted to fix the amount they are to pay the state in taxes, not only *ad valorem* but also occupational. (The eminently practical result that it is possible for the mining companies to achieve if they are permitted to peg the Lake Erie price low is shown in the fact that for the year 1923 they paid to the state occupational taxes in the amount of $6,126,443, and in the year 1929, when the shipments were higher and the pegged price lower, they paid only $3,786,352. Minn. Tax Comm. Rep. 1932, p. 81.)

As far as can be ascertained, this is the first time in our courts that the Lake Erie base price has ever been the subject of judicial scrutiny. What, therefore, is the Lake Erie base price? What is its significance? How is it arrived at? What does it mean in this case? Judge Martin Hughes, one of the trial judges in the court below, in a well considered dissenting memorandum, thus characterizes it:

412

"The so-called Lake Erie base price is fixed in a peculiar manner. The first chance sale of ore at the opening of the season fixes the maximum base price at Lake Erie ports. The price paid at that sale is published in the trade magazines and from that the sellers of iron ore learn the maximum price that they are to receive for their ore during that season. It is plain that such price is not one that is arrived at in a free, open market, but is, on the contrary, a fixed, fictitious and artificial price which the ore companies themselves have made."

In my opinion, there is no foundation in the record for the statement in the majority opinion that all parties recognized the Lake Erie base price as an appropriate means for ascertaining value. The position of the state respecting the Lake Erie base price is stated as follows:

"That Lake Erie published prices are artificial and unreal and do not reflect or indicate the market price or true value of iron ore, is completely demonstrated in the proposition that the published Lake Erie price of all classes of ore was the same in each of the years 1929, 1930, 1931 and 1932, although there was shipped from Minnesota in 1929, 47,478,167 tons of ore; in 1930, 34,881,010 tons; in 1931, 17,309,211 tons; and in 1932 approximately 2,250,200 tons. (Minn. Tax Com. Rep. 1932, p. 51). And Minnesota produces about sixty per cent of all iron ore consumed in the steel industry of the United States.

"To say the least, there can be no fair certainty that the Lake Erie price indicates the true value of iron ore. If that be so, no calculation which assumes the value of a ton of iron ore to be that stated in Lake Erie published prices can have sufficient certainty to overthrow any valuation placed upon iron ore for assessment purposes; using such a factor, no one can know whether the result arrived at is right or wrong. * * * This testimony is based upon rumor or hearsay; no witness knew definitely or exactly where the trade papers got the figure which they posted as the Lake Erie price for the year."

The arbitrary and artificial character of the Lake Erie price cannot better be illustrated than to observe that the Lake Erie price of ore has remained exactly the same for the past six years, whereas pig iron, which is no more than smelted ore, has fluctuated in price from year to year during the same period, the price per ton never being the same for any two consecutive years. There is and has been a continuing free market for pig iron, the market price of which varies from day to day.

In this record, nowhere has there been any attempt to show the relationship between the Lake Erie annual pegged price for iron ore and the pig iron price variations, the prices of which should be, if they are true prices, as clearly and patently related as are the market prices of wheat and flour. We would not listen in patience to a value fixed on a pegged, artificial, or arbitrary price of wheat which totally disregarded a fluctuating market value for flour. Nowhere has there been any effort made by the defendants to give to the court those figures and facts in their possession which would show the relationship between iron ore values and pig iron prices. On the contrary, the defendants sought to sustain values by showing the Lake Erie pegged or artificial price of iron ore and sought to support this fictitious price with expert opinion where fairness should have required them to place in the hands of the court all facts and figures which would have thrown light upon the full and true market value of iron ore. It will not do for the defendants to hide behind expert opinion and fail to produce facts. Their position taken respecting the Lake Erie base price characterizes their entire attitude throughout this lengthy hearing, the purpose of which should have been to arm the court with facts so as to permit it to determine whether or not the taxes assessed were in truth excessive and therefore unfair.

The tax here imposed is the same tax as that imposed on other real property in the state. There is no statute setting up a different method of valuation for mining property. In this connection again I quote from Judge Hughes' dissenting memorandum:

"Computing the value of ore bodies upon the present worth of the net profits to be made therefrom, while all other real property in

the state is assessed upon its real value, seems unfair. By that method of valuation the owners of ore bodies are placed in a special, favored class; there is no other property in the state that is assessed for ad valorem tax purposes in the same manner as are the ore bodies."

The power to tax has been defined as the power of the state to enforce proportional contribution from persons and property for the support of the government for all public needs. The power is essential to the existence of an organized political community. In the language of Nicol v. Ames, 173 U. S. 509, 515, 19 S. Ct. 522, 525, 43 L. ed. 786:

"The power to tax is the one great power upon which the whole national fabric is based. It is as necessary to the existence and prosperity of a nation as is the air he breathes to the natural man."

There is no room in the law of taxation for the bestowal of special favor. There is no basis in the law and no sound reason why the mining companies should be treated differently than are other taxpayers. Again quoting from the dissenting memorandum of Judge Hughes bearing upon the position of defendants that they should pay taxes based on the present worth of net profits computed on the basis of ore values as determined by the Lake Erie price:

"If all real property in the state were assessed upon that basis from whence would the revenues be derived to pay the running expenses of the state and its political subdivisions?

"I have no doubt that the farmers, who as a class have been operating at a loss for the last 15 years and have been headed toward bankruptcy, would be pleased if they had been permitted to pay taxes on the present worth of their net profits. They have been paying taxes upon the valuation of their farms although there were no profits. The owner of an office building which now and for some time past has been sparsely tenanted would undoubtedly prefer to pay taxes upon the basis of the present worth of his net profits instead of upon the value of his building. The home owner, and in fact all other property owners would undoubtedly be pleased

at the opportunity to exchange the present method of valuation upon their properties for the one that has been applied to the mines.

"The defendants claim that owing to there being but few sales of ore bodies there is no other means of determining their values except by the use of their method. It is true that ore bodies are not frequently the subject of purchase and sale. Many other classes of property are likewise very infrequently sold. Large buildings in the big cities are rarely sold; sales of farms, except by judicial process, have been rare for some years; but this has not necessitated the introduction of a unique method for determining their values."

The objections to basing tax values on the Lake Erie price are not answered by stating that it is a price that is pegged high. Whether it is pegged high or pegged low, it still is admittedly artificial, fictitious, and arbitrary. On this first opportunity given to the courts of this state to inquire into the facts respecting the Lake Erie price and its relationship, if any, to a fair valuation of mining properties, that inquiry should have been made fully and fairly. This was not done. The result is that those most vitally interested are by this decision placed in the singular position of being able to control the amount of tax revenue to be paid the state.

To allow the defendants to overturn a tax valuation without requiring them to produce all facts and figures and all evidence of real probative value to which they alone have access showing the full and true value of their properties offends my sense of fairness and justice and is totally wanting in legal precedent. No court anywhere has ever overturned a state tax valuation when the attack upon such valuation has been based upon a pegged, fictitious, and artificial value, unrelated to values fairly arrived at in a free and open market.

As a matter of law, the defendants herein have, in my opinion, in every respect failed to sustain the burden of proof which the law imposes upon them. They have failed to produce information upon which accurate values could have been determined. They have relied upon pegged prices sustained by expert testimony when they possessed every fact and figure needed for an intelligent and fair determination of their claim of excessive valuation. They are en-

titled to no relief for the plain reason that they produced no credible testimony upon which the court could find that the valuation as fixed by the tax commission was unfair or excessive.

The orders of the trial court should be reversed.