COUNTY OF FREEBORN v. FIRST NATIONAL BANK OF
ALDEN.[1]

January 15, 1937.

No. 31,039.

*Meighen, Knudson & Sturtz,* for appellant.
*Elmer R. Peterson,* County Attorney, for respondent.

JULIUS J. OLSON, JUSTICE.

In proceedings to enforce payment of delinquent personal property taxes against the First National Bank of Alden, in Freeborn county, levied in the year 1933 but due and payable in 1934, the taxpayer, said First National Bank, hereinafter referred to as the bank, answered the state's citation and sought relief for various

[1]Reported in 270 N. W. 908.

reasons therein pleaded. After trial had before the court, findings were made sustaining the tax as levied. The bank moved for amended findings, all of which were denied. The appeal is from a judgment entered pursuant to the findings.

The essential facts appear to be these: On March 4, 1933, in conformity with the proclamation of the President, the bank was closed. On March 19 it was placed in the hands of a conservator duly appointed by the comptroller of the currency pursuant to the provisions of the Bank Conservation Act, 12 USCA, § 203, approved March 9, 1933, and remained under his control until June 3, 1933, when it was reopened under its original charter. The reopening was made possible by new money being put into the capital structure and, to a much greater extent, by a voluntary waiver of 25 per cent on the part of depositors of their several deposits amounting to $56,994.92. Therein the several creditors of the bank, "for the purpose of rehabilitating it," transferred and assigned to three named trustees all their right to 25 per cent of their deposits "to be used by such Trustees in purchasing nonliquid and depreciated assets from the said Bank for the purpose of eliminating such assets and in order to enable said Bank to reopen; and the said Bank is authorized to recognize and treat this assignment as a withdrawal from the net accounts of all creditors bound by this and similar agreements of 25% of said accounts in favor of the above named Trustees, and to debit or charge such net accounts of such creditors with the amount of said assignment, * * *." In exchange and as consideration "for such assignment," the assenting depositors agreed to look to the trusteed assets for their reimbursement.

The assets of the bank "charged off" by direction of the comptroller were as follows: Loans and discounts, $55,111.56; bonds, $10,252.88; banking house, $2,600; furniture and fixtures, $5,585; total, $73,549.44.

The capital structure at the time of the closing of the bank included capital stock of the par value of $55,000. In the reorganized bank the capital was reduced to $30,000. The court in its findings said:

"The evidence is that the outstanding stock of $55,000 was turned in to the comptroller and new stock issued to the extent of $30,000 for the consideration of $7,000 cash paid by the directors, and $23,000 of so-called 'stockholders' notes.' What has become of the original $55,000 of stock or the double liability of the stockholders thereunder does not appear."

The undisputed testimony is, however, that "all the old stock was wiped out" and that the $30,000 new capital was evidenced by "new stock issued." The assessment made by the assessor as of May 1 was based upon the assumption that the capital stock was of the full par value and in the amount of the issued and outstanding capital stock at time of closing, $55,000. From this sum he deducted the value of the banking house, $5,000, leaving the net amount to be taxed at $50,000. This valuation, pursuant to 1 Mason Minn. St. 1927, § 2026-1, was assessed upon a basis of 33 1/3 per cent, or $16,666.67. The rate applied, 81 mills, equalled $1,350.27. Under the provisions of L. 1933, c. 315, the bank, being a national institution, could enter into an agreement with the taxing authorities to pay this tax at 75 per cent thereof, that is to say, $1,012.69. In this sum the court held the bank to liability.

The section to which we have referred (§ 2026-1) provides:

"The stock of every bank * * * organized under the laws of this state or of the United States, shall be assessed and taxed in the town, city or village where such bank * * * is located, whether the stockholders of such bank reside in such place or not, and shall be assessed in the name of the bank * * *. To aid the assessor in determining the value of such shares of stock, the accounting officer of every such bank * * * shall furnish to the assessor a sworn statement showing the amount and number of the shares of the capital stock, the amount of its surplus, undivided profits and all other funds, and the amount of its legally authorized investments in real estate located in this state, which real estate shall be assessed and taxed as other real estate. The assessor shall deduct the amount of such legally authorized investments in real estate from the aggregate amount of such capital, surplus, undivid-

ed profits, and other funds, and the remainder shall be taken as a basis for the valuation of such shares in the hands of the stock-holders, and shall be assessed at thirty-three and one-third (33 1/3) per cent of its *true and full value*."

So the determinative question is: What was the value of all the shares of stock in this bank on May 1, 1933? Obviously, then, if the bank were insolvent in fact, as claimed by the bank, the "true and full value" of its capital stock in all probability was much less than par. It might well be that the entire value was gone. That, in substance, is the testimony for the bank. If the bank had gone into liquidation it is conceivable that if such tax were to be imposed and collected the money with which to meet it would have to be taken out of the assets of the bank, which otherwise properly belonged first and foremost to its creditors.

The bank's depositors were of course chargeable with the moneys and credits tax as to their individual deposits. If, as is so often the case where banks go through liquidation, such depositors have to take losses upon their deposits, must they also bear the burden of the capital stock tax where, as here, the bank is in the hands of a receiver or conservator when the assessment is made? We think not. See City of Boston v. Beal (C. C.) 51 F. 306; Brown v. French (C. C.) 80 F. 166; Stapylton v. Thaggard (C. C. A.) 91 F. 93.

We think it is clear that what is sought under the statute quoted is to reach the "true and full value" of the stock in the particular bank when and as so assessed. Certainly it would be a strained construction to hold that such stock is, under the facts and circumstances here appearing, worth par.

The evidence is persuasive that the tax levied upon the basis here shown is unjust and unfair. Obviously the stock "has been assessed and taxed at a valuation greater than its real and actual value." 1 Mason Minn. St. 1927, § 2120. There should be no great difficulty for the trier of fact to arrive at the "true and full value" of this bank stock as of May 1, 1933. Bank records are easily available. These and other pertinent facts can undoubtedly be had. There is absolutely nothing in this record, aside from the tax levy itself,

that shows these shares of stock had any value as of May 1. When this assessment was made the bank was in the hands of a conservator, its future shrouded in uncertainty. On June 3 the new money came into the bank from directors to the extent of $7,000, and then, too, is when the stockholders' notes came into being. The stockholders came into the reorganized bank and gave their notes in the amount of $23,000. As security for the payment of these, they put up their new bank shares. These notes and the mentioned $7,000 paid in by the directors constitute the new capitalization. (These notes, however, are to be held in trust and to be enforced, when and as necessary, in meeting the losses that might be entailed by reason of the slow and other charged-off assets placed with the trustees under the agreement. There is a provision that the other assets so trusteed shall first be exhausted before resort to the stockholders' notes is to be had. This arrangement may have its implications and be of considerable importance in determining the value of the corporate stock as of May 1, 1933.)

Under the provisions of § 2120, the taxpayer is given a right to defend against an assessment upon the ground that his property "has been assessed and taxed at a valuation greater than its real and actual value." While it is true that the burden rests upon him to show such overvaluation, we think the present record clearly meets that requirement.

We had occasion recently in State v. Oliver I. Min. Co. 198 Minn. 385, 270 N. W. 609, to consider this question, and the applicable cases are therein cited.

■ We are not impressed with the bank's notion that because the bank was in the hands of a conservator it is absolved from taxation. As a corporate entity it still existed. Rosenblatt v. Johnston, 104 U. S. 462, 26 L. ed. 832. The conservator took charge to conserve the bank and its assets. A reorganization resulted; as such the corporate entity continued.

We have assumed that the "tax reduction agreement" referred to by counsel (see respondent's brief, pp. 2-3) was duly made and is properly in the case. Mr. Amel signed it as president of the bank. He was also the conservator. As such, we think it was his duty

34

to make a return in respect of taxes. See Hazen v. Hardee, 64 App. D. C. 346, 78 F. (2d) 230. That the bank shares had some value, perhaps much more than here appears, is possible. That will be determined when the matter comes up for retrial. But upon this record we cannot avoid the conclusion that the stock was of much less value than the $55,000 made the basis for the present assessment. The case must go back for a new trial.

So ordered.

MR. JUSTICE PETERSON, not having been a member of the court when this case was argued and submitted, took no part in its consideration or determination.